SMITH, HINCHMAN & GRYLLS ASSOCIATES, INC., *v.* RIVER ROUGE BUILDING AUTHORITY.

1. Municipal Corporations—Building Authority—Principal and Agent—Liability for Debts.

A building authority which is incorporated by a city for the purpose of acquiring a site for and the placing of a building thereon pursuant to general statute authorizing counties, cities, villages, or townships so to do permits the municipal corporation to use the building authority as its agent and become liable for indebtedness of such agent (CL 1948 and CLS 1961, § 123.951 *et seq.*).

2. Same—Building Authority—Contract with Architect—Principal and Agent.

Defendant city's action creating and incorporating defendant building authority which was under the complete control of the city council and did nothing and entered into no contract with plaintiff architect until the contract, its plans, and its work

---

References for Points in Headnotes

[1, 2] 38 Am Jur, Municipal Corporations § 493 *et seq.*
[3] 38 Am Jur, Municipal Corporations § 705.
[4] 38 Am Jur, Municipal Corporations § 672.

were approved by the council, constituted the building authority an agent of the city and made the city liable under the contract for architectural services, notwithstanding bond issue for the purpose was not approved by the voters (CL 1948 and CLS 1961, § 123.951 *et seq.*; § 141.101 *et seq.*).

3. SAME—CONTRACTS—CERTIFICATION OF CLAIMS—DEFENSES AVAILABLE—PRETRIAL STATEMENT.

City's defense to action by firm of architects for services rendered under a building contract that claim had not been certified in accordance with city's charter requirements as to claims against it *held*, unavailable, where the claim had not been rejected on such ground and such defense had not been included in the pretrial statement (City of River Rouge Charter, ch 7, § 8).

4. INTEREST—CONTRACT FOR ARCHITECTURAL SERVICES—DEMAND.

Interest at 5% on claim under contract for architectural services is allowed from date of written demand therefor, where amount had never been disputed by defendant city.

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted November 6, 1964. (Calendar No. 15, Docket No. 50,203.) Decided February 2, 1965.

Declaration by Smith, Hinchman & Grylls Associates, Incorporated, a Michigan corporation, against the River Rouge Public Building Authority, a Michigan corporation, and the city of River Rouge, a Michigan municipal corporation, for failure to pay for services rendered. Default judgment entered against defendant authority. Judgment for defendant city. Plaintiff appeals. Reversed and judgment ordered entered against defendant city.

*Beaumont, Smith & Harris* (*Alfred E. Lindbloom,* of counsel) for plaintiff.

*Thomas Roy Finn,* for defendant city.

DETHMERS, J. Plaintiff is a firm of architects. It sued the 2 defendants for $32,866.14, the amount

it claims due on contract for services rendered. A default judgment was entered against defendant building authority. After trial a judgment of no cause for action was entered in favor of defendant city. Plaintiff appeals.

The city had desired to build a civic center and new city hall. Acting under the provisions of PA 1948 (1st Ex Sess), No 31 (CL 1948 and CLS 1961, § 123.951 *et seq.* [Stat Ann 1961 Rev § 5.301(1) *et seq.*]), it incorporated the building authority. The latter was governed by 3 commissioners appointed by the city council which also appointed 2 directors to serve as liaison between the council and the authority, namely, the mayor and a councilman. Thereafter, that councilman informed a representative of plaintiff that it had been selected to handle the architectural work for the entire program. The September 16, 1958, minutes of the authority recite that it held a special meeting with plaintiff's representatives, members of the council and various city department heads; and further, that, "It was agreed that, subject to formal approval by the council and approval as to form by legal advisor, the contract would be promptly signed. The architect's fees should run about $159,000 for all projects not including supervision." A contract between plaintiff and the authority was signed accordingly on September 22, 1958. The September 29, 1958, minutes of the authority recite that a meeting of the authority, with representatives of plaintiff and members of the city council was held, and that, "The modified schematic drawings tentatively approved by the commission were submitted to the council and approved as submitted." The minutes further contain a recital that interim agreements be made so that the commission (authority) might draw from city funds the $100,000 which the council had set

aside for that purpose.   October 27, 1958, minutes of the authority contain this:

"The general plans and site for the new municipal program was [*sic*] approved by the council, as recommended by the public building authority, and the architects were instructed to proceed with final working drawings and specifications."

And on December 16, 1958, the city council adopted a motion "that the general plans and site for the new municipal program be approved as recommended by the public building authority."

On August 10, 1959, the authority leased property to the city. The lease provided that the authority should, on or before January 1, 1960, enter into final contracts for construction on the leased property of a city hall in accordance with plans and specifications prepared by plaintiff. Under the lease the city was to pay rent to the authority for use of the buildings. This money was to be used by the authority to pay off the bonds from the proceeds of which the buildings were to be built. The authority secured the permission of the Michigan municipal finance commission to issue revenue bonds for the project. The authority wrote plaintiff on October 19, 1959, that its ordinance No 1 stipulated that a construction contract should be entered into by January 1, 1960, and that bids should be received by December 2, 1959. Plaintiff complied therewith, completed the plans and specifications and set into operation procedures to secure bids for the construction. At this point a city referendum was held and a bond issue for the project was voted down. The following statement in plaintiff's brief is supported by the record:

"There were two interim agreements entered into by and between the authority and the city. The first one is dated November 17, 1958, and the sec-

ond March 9, 1959. These agreements are subsequent to contract with plaintiff. Both interim agreements recite that the city requires office space and that it created the authority to acquire buildings and lands which could be leased to the city and that until the contract of lease is executed, the authority is initially without funds with which to engage services for the preparation of specifications, et cetera. Under each agreement the city advanced $50,000 to the authority and each agreement provided that this money should be considered as advance rent under the proposed lease. The second interim agreement also recites that the city had budgeted the sum of $100,000 to be paid during the present budgetary period. In each contract it was agreed that the foregoing amount of advance shall be used by the authority for engineering fees and the necessary requirements for the construction of the proposed building.

"The authority paid all of its bills, except the amount which it now owes plaintiff. The public building authority in its final accounting to the city, showed that it owed Smith, Hinchman & Grylls the amount now being sued for."

Plaintiff frequently requested payment of the city attorney, who asked that plaintiff confirm the request by letter. Plaintiff wrote such letter to the city attorney requesting payment of the amount here sued for. The amount has never been questioned and the city attorney frequently thereafter assured plaintiff that he would take up the matter with the council. Never did he object to the letter on the basis of its not being sworn to. Thereafter, there were numerous telephone conversations between plaintiff and the city attorney, who constantly stated that he would take up the account further with the council. He again asked for a letter from plaintiff which he could present to the council and plaintiff sent him such letter which was never challenged on the ground

of being unsworn. In the course of time it developed that the city attorney had doubts about the city's legal right to pay plaintiff's account. He then told plaintiff, in effect, that inasmuch as the public building authority had incurred expenses beyond the $100,000 advanced to it by the city, the question was whether under such circumstances the city was liable for such excess.

Apparently the city's refusal to pay was based entirely on the doubt expressed by the city attorney as to its liability and authority to pay the account. This problem seems to have been touched off by the electors' voting down the bond issue.

The pretrial conference statement contained this language:

"The issues are factual as to the existence of an agency between the building authority and the city, legal as to whether the city is liable for acts of the building authority."

It contained no statement that defendants raised as a defense plaintiff's failure to comply with charter requirement that a claim presented against the city shall be certified to or verified.

That the city's initial reason for nonpayment, as above indicated, is still one of its contentions on appeal here, appears from the statement in its brief of the first 2 questions involved, as follows:

"1. Where the defendant, as the incorporating unit, created a building authority, pursuant to PA 1948 (1st Ex Sess), No 31, to acquire land and construct a municipal building to house all city offices, to lease same to the city at an annual rental sufficient to pay off revenue bonds to be issued by the authority under PA 1933, No 94 (CL 1948 and CLS 1961, § 141.101 *et seq.* [Stat Ann 1958 Rev and Stat Ann 1959 Cum Supp § 5.2731 *et seq.*]), to cover construction costs, and architectural fees, and the de-

fendant, city, advanced to the authority $100,000, as advanced rental under the contemplated lease, which the authority was authorized to expend for architectural services and office expenses, is the city liable to the plaintiff for architectural services rendered under a contract between the plaintiff and the authority, in excess of the aforesaid amount of advanced rental, when the revenue bond issue was voted down at a referendum election leaving the authority without funds to pay balance due plaintiff?

"The lower court answered, 'No.'
"Appellee contends it should be answered, 'No.'
"2. Is a building authority incorporated under the provisions of PA 1948 (1st Ex Sess), No 31, the agent of the incorporating unit, defendant herein, so that the incorporating unit is liable for the debts of the authority in carrying out its corporate powers?
"The lower court answered, 'No.'
"Appellee contends it should be answered, 'No.' "

Defendant's position boils down to this, that the sum sued for is due plaintiff on a contract between plaintiff and the authority only and that it is, therefore, the debt of the authority, not the debt of the city. The city says that because it was not competent, prior to enactment of the statute here involved, for it to issue general obligation bonds pledging the full faith and credit of the city for payment of the new facilities, the statute was enacted to permit an authority to accomplish that which the city could not of itself do. It then points to this Court's holding in *Rude* v. *Muskegon County Building Authority*, 338 Mich 363, which, as applied here, would mean that the authority is not the alter ego of the city. So, asks defendant city, there being no privity of contract between the city and plaintiff, and the city and the authority being separate corporate entities,

on what basis can plaintiff here hope to establish liability on the city's part? Having stated that the city could not issue full faith and credit bonds for the project, that it could not build the facility, pay for it by revenue bonds and pay these off out of rent paid by itself to itself on a lease from itself to itself, before the statute in question was enacted, defendant concludes that the city cannot do indirectly through the statute what it could not do directly without it.

The fallacy in defendant's use of that old shibboleth is that while, as stated by defendant, it expresses the existence of the statute in the first instance, lacking in the second, it ignores the possible effects thereof. Although the statute does not speak in terms of agency or expressly provide that the city shall become liable for indebtedness incurred by the authority, have not the actions permitted and taken under it operated to make it so?

The only money available to the authority for expenses to be incurred prior to sale of bonds was the $100,000 paid to it by the city as an advance on rent for future contemplated occupancy of the buildings by the city. No other source was provided by the statute. Section 27 of the revenue bond act (CL 1948, § 141.127 [Stat Ann 1958 Rev § 5.2757]) provides that before bonds may issue a sworn application to the municipal finance commission shall be filed with an estimate of the cost of the project. Although a referendum is not required as a prerequisite to the bond issue, section 33 of the act (CL 1948, § 141.133 [Stat Ann 1958 Rev § 5.2763]) provides that on petition of not less than 10% of the registered voters, filed within a certain time, as was done here, a referendum shall be held. Hence, the statute contemplates expenditure or incurring indebtedness by the authority for plans, specifications and estimates prior to filing the application to the

State commission for permission to sell bonds and, at the same time, the possibility that sale of bonds and realization of revenue from that source may never occur because of intervention of a referendum. What must be said, then, of legislative intent as to how such preliminaries are to be paid for, if not by the city? We think the statute here involved and the said revenue bond act and the meaning of this Court's decision in *Walinske v. Detroit-Wayne Joint Building Authority*, 325 Mich 562, impel to the conclusion that it is competent for the city to become liable for this obligation. Did it do so?

Plaintiff, recognizing that the authority is not the alter ego of the city, contends that it is nevertheless its agent and was such in incurring the obligation to plaintiff. This we think supported by the meaning of the governing statute and by the extent of the city's control over the authority. Not only did it create and incorporate the authority, but further, acting through the council, it appointed its 3-man commission, its governing authority, and also 2 directors, one the mayor and the other a councilman, to serve as liaison between council and authority; the authority had no right to do anything except acquire property, build facilities thereon for the city and ultimately convey same to the city; the authority had and could have no assets save those received from the city until its bonds were sold; the authority did nothing and entered into no contract with plaintiff until it was approved by the council. The authority was under the complete control of the council, which approved plaintiff's contract, its plans, and its work. We think the purpose for which the authority was created and the extent of the city's control made the authority nothing more than an agent of the city. We hold that the city, acting through its agent, the authority, made itself liable to plaintiff. Analogous, although not on all fours,

and leading to this conclusion are *Herman* v. *Mobile Homes Corporation,* 317 Mich 233, and *City of Dearborn* v. *Michigan Turnpike Authority,* 344 Mich 37.

On appeal here defendant urges as additional reason for affirmance of judgment in its favor the fact that plaintiff filed no sworn or certified statement or claim against the city with the city council. The pertinent charter provisions of the city, chapter 7, § 8, after providing that the council shall audit all accounts chargeable against the city and that no account shall be received unless it is accompanied by a certificate that the services have been rendered and the amount is owing, further provides:

"It shall be a sufficient defense in any court to any action or proceeding for the collection of any demand or claim against the city for personal injuries or otherwise, that it has never been presented, certified to or verified as aforesaid, to the council for allowance; or, if such action is founded on contract, that the same was presented without the certificate or affidavit aforesaid and rejected for that reason."

Plaintiff contends that the above recited facts with respect to communications back and forth between plaintiff and the city attorney and the letters written by plaintiff at his request, after the authority had already reported this indebtedness to plaintiff in its final accounting to the city, amount to substantial compliance with the charter provision. Be that as it may, there is no showing here that plaintiff's claim, being unsworn or uncertified, was ever, in the language of the charter, "rejected for that reason." In addition, this defense was not included in the pretrial statement. We think it cannot stand now.

Judgment below in favor of defendant city is reversed, and it is ordered that judgment be entered there in favor of plaintiff and against the city in the amount of $32,866.14, together with interest at

5% from date of written demand for payment in that amount, March 23, 1960. Costs to plaintiff.

KAVANAGH, C. J., and KELLY, BLACK, SOURIS, SMITH, O'HARA, and ADAMS, JJ., concurred.