**ACCIDENT FUND, a Legal Entity Authorized by the Michigan Legislature Pursuant to 1912 PA 10 (First Extra Session) Part V, § 1; 1915 CL 5477, Ward Ellison and Max Grost, individually, Elston-Richard Storage Company and Russell Jameson, individually, Plaintiffs,**

v.

**Nancy A. BAERWALDT, Commissioner of Insurance of the State of Michigan, Richard A. Ross, Personnel Director of the State of Michigan, and William S. Ballenger, Director of the Department of Licensing and Regulation of the State of Michigan, Defendants.**

No. G 81–224.

United States District Court,
W. D. Michigan, S. D.

Aug. 19, 1982.

Theodore W. Swift, David C. Coey, Frank J. Nerat, Jr., Lansing, Mich., for plaintiffs.

Harry G. Iwasko, Jr., Louis Porter, Asst. Attys. Gen., Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

In this case, the Michigan Attorney General has moved the Court for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, positing the following issue for resolution: Is the State Accident Fund an agency or instrumentality of the State of Michigan?

Plaintiffs' Complaint for Injunctive and Declaratory Relief alleges, *inter alia*, a violation by Defendants of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*, and is predicated upon an alleged interference by Defendants with an "Employee's Pension Trust and Plan" presently maintained by the State Accident Fund. It is well settled that the provisions of ERISA do not apply to "governmental plans," 29 U.S.C. § 1003(b)(1), as defined in 29 U.S.C. § 1002(32), which includes: "a plan established or maintained for its employees by ... the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." Hence, if the State Accident Fund is an agency or instrumentality of the State of Michigan, the provisions of ERISA do not apply.

Unfortunately, the Court cannot look to any decisions of the Michigan Supreme Court or Court of Appeals for guidance on the immediate question, as there is an absolute paucity of case authority on the issue. Indeed, considerable research discloses only a series of opinions of the State Attorney General on the subject, the latest of which was released in December, 1976 (O.A.G. 1976, No. 5147) and concluded that the State Accident Fund did fall within the parameters of a state agency or instrumentality. After analyzing and reflecting upon the briefs submitted and research undertaken, I am persuaded that the State Attorney General is not in error.

Both parties have undertaken extensive reviews of the statutory background of the State Accident Fund, which need not be repeated here. It is important though, to note that the State Accident Fund was created in 1912 as Part I of the first Michigan Worker's Compensation Act, 1912 P.A. 10 (First Extra Session) Part V § 1.

Under this Act, an employer in this state could make a choice between four methods of payment of workers' compensation claims: (1) self-insurance; (2) insurance through a liability insurer; (3) an employers insurance association; and, (4) "(t)o request the Commissioner of Insurance of the State of Michigan to assume the administration of the disbursement of such compensation ... and the collection of the premiums and assessments necessary to pay the same as provided in part five hereof". Part V outlined the requirements for creation of the State Accident Fund and its administration:

SECTION 1. Whenever five or more employers, ... shall in writing request the Commissioner of Insurance so to do, he shall assume charge of levying and collection from them such premium and dividends as may from time to time be necessary to pay the sums which shall become due their employees, ... as compensation under the provisions of this act, and also the expense of conducting the administration of such funds; and shall disburse the same to the persons entitled to re-

ceive such compensation under the provisions of this act: Provided, however, that neither the Commissioner of Insurance nor the State of Michigan shall become or be liable or responsible for the payment of claims for compensation under the provisions of this act beyond the extent of the funds so collected and received by him as hereinafter provided.

Section 2 of Part V sets forth the responsibility of the Commissioner of Insurance when a duly executed petition was received from five or more employers, as outlined in Section 1.

The Commissioner of Insurance shall immediately upon assuming the administration of the collection and disbursement of the moneys referred to in the preceding section, cause to be created *in the State treasury a fund to be known as 'accident fund'*. Each such employer shall contribute to this fund to the extent of such premiums or assessments as the commissioner shall deem necessary to pay the compensation accruing under this act to employes of such employers ... the Commissioner of Insurance shall give a good and sufficient bond in the sum of Twenty-five Thousand Dollars, executed by some surety company..., covering the collection and disbursement of all moneys that may come into his hands under the provisions of this Act. The premium on said bond shall be paid out of the general funds of the State or on order of the Auditor General. Said bond must be approved by the board of State auditors. (Emphasis supplied).

Part V of the Act further indicated that the "accident fund" was to "ultimately become neither more nor less than self-supporting"; the premiums or adjustments levied for such purpose being subject to readjustment periodically by the Commissioner of Insurance as may become necessary (Section 3). In collecting these premiums, the Commissioner of Insurance was charged with the discretion to classify the sundry establishments of employers, according to the nature of the business engaged in and the probable risk of injury to employees.

As part of this responsibility, the Commissioner was empowered to determine the amount of premiums or assessments which the employers would be required to pay into the "accident fund," and could prescribe when and in what manner these premiums and assessments had to be paid. This determination, moreover, was subject to reassessment by the Commissioner of Insurance to allow for changes in circumstances. The only limitation to this power of assessment being that; "such premiums ... shall be levied on a basis that shall be fair, equitable and just as among such employers." (Section 4). If in the event of a default by an employer in the payment of any contribution, premium or assessment required as aforestated by the Commissioner of Insurance, the sum due; "shall be collected by an action at law *in the name of the State as plaintiff,* ..." (Section 5, emphasis supplied). A civil action in the name of the State may also be maintained if an employer refuses to allow the Commissioner of Insurance to inspect the books, records, and payrolls of the employer for the purpose of ascertaining any information the Commissioner; "may require in the administration" of the "accident fund" (Section 8).

To effectuate the purposes of the Act, the Commissioner of Insurance in Section 9 was authorized to: "employ such deputies and assistants and clerical help as may be necessary, and as the board of State auditors may authorize, for the proper administration of said funds and the performance of the duties imposed upon him by the provisions of this act." Compensation for these employees was fixed by the board of State auditors, but all salaries and expenses were charged to and paid out of the accident fund. The ability to terminate the employment of any employee of the Fund rested with the Commissioner of Insurance.

This statutory framework, except for a few minor permutations, remained entirely under the control of a state official, up to and including the present enabling act, M.C.L. § 418.701 *et seq*; M.S.A. § 17.-237(701) *et seq*, which allows that the State Accident Fund is: "created to provide workmen's compensation insurance for em-ployers under the supervision of the commissioner of insurance, ..." Section 701 goes on to state:

Upon compliance with the rules concerning insurance adopted by the commissioner, membership in and coverage by the Fund shall be provided to employers subject to this act who shall request such membership and coverage of the Fund in writing. Thereupon the accident fund shall assume charge of levying and collection from the employers such premiums or assessments as may be necessary from time to time to pay the sums which become due under the provisions of this act and also the expense of administration; and shall disburse such sums in accordance with the provisions of this act. Neither the commissioner nor the state shall be liable or responsible for the payment of claims for compensation under the provisions of this act beyond the extent of the sums so collected and received.

The entire statutory scheme is appended hereto as Appendix A. Noteworthy within the provisions of the Act is the enabling language which permits the Commissioner of Insurance to employ such deputies, assistants and clerical help as may be necessary, and as the advisory board may authorize for the proper administration of the accident fund and the performance of the duties imposed upon the Commissioner of Insurance by the provisions of the Act. These employees may be terminated in the sole discretion of the Commissioner of Insurance, although they are compensated at rates fixed by the advisory board. Significantly, the fund itself is still retained in the treasury of the State of Michigan.

It is against this background, that the Court must determine whether the State Accident Fund is a state agency or instrumentality. The appellate courts of Michigan have not directly addressed the instant question, however, relevant case authority is available and supplies the appropriate standard upon which this issue can be resolved. Two distinct standards have been formulated, although the Court notes in

passing that neither party to this litigation has recognized this distinction or discussed it. The two lines of authority are easily classified as pertaining to revenue related functions and service related functions.

The seminal decision under the revenue related grouping appears in *Rude v. Muskegon County Building Authority*, 338 Mich. 363, 61 N.W.2d 88 (1953), where suit was brought to enjoin a county building authority from issuing $200,000 of bonds for the purpose of acquiring a building for county welfare functions, and for a declaration of rights. The Muskegon County Circuit Court entered a decree for the plaintiff and the defendants appealed. The Supreme Court focused upon a bifurcated test in an effort to resolve whether the County building authority was a county agency or instrumentality and held, *inter alia*, that the county building authority, created under M.C.L.A. § 123.951 *et seq*; M.S.A. § 5.301(1) *et seq*, was not the *alter ego* of the county and in doing so wrote:

> While the authority is in a sense a county wide municipal corporation, it is limited in its scope of activities even inside of county affairs. The legislature in enacting the statute providing for the creation of an authority evidently *intended* it to be a separate body from the board of supervisors. The board of supervisors in this case evidently intended the authority to carry on specific activities with *which from then on, the board need not necessarily directly concern itself.* (Emphasis supplied). *Id.* at 366, 61 N.W.2d 88.

The *Rude* court further found that the city and county had not pledged their *full faith and credit* behind the bonds, but merely agreed to pay over a reasonable annual rental "for the use of the building". *Id.* at 368–369, 61 N.W.2d 88. Indeed, the court held that pursuant to M.C.L.A. § 123.951 *et seq, supra,* and the terms of the issued bonds, the county building authority was the sole obligor on the bonds. Accordingly, the building authority was determined not to be a county agency.

*Rude* was cited with approval in *City of Dearborn v. Michigan Turnpike Authority,*

344 Mich. 37, 73 N.W.2d 544 (1955), where an action was brought by the city against the turnpike authority to obtain a declaration of rights and an injunction restraining the authority from acquiring properties within the city for a turnpike highway. The city sought to declare that the turnpike authority was an administrative agency of the State government, while the turnpike authority maintained that it was an agent of the State, existing separately from it. The Supreme Court, in reaching a decision on the issue, applied both the alter ego and full faith and credit standards in favor of finding that the authority existed separately from the State. In doing so, the court opined with respect to the alter ego doctrine:

> The legislature *clearly expressed its intention* that the Turnpike Authority *should not be considered as an alter ego of the State,* and that said Authority should be distinguished from the general State departments supported by general taxation. The legislature set up definite purposes, definite methods, whereby costs of construction and operation should be met without imposing a tax load on the people of the State. There is a provision in this act that after the turnpike highway is paid for from revenue collected from those who use the highway, said turnpike highway should be taken over by the State as part of the State highway system. (Emphasis supplied). *Id.* at 57, 73 N.W.2d 544.

In essence the *Dearborn* court focused on the separateness of the Turnpike Authority and the autonomy of the Authority's operation. In addition the *Dearborn* panel noted, in support of a finding of autonomy, that the full faith and credit of the State of Michigan was not pledged as the bonds issued to purchase the property, upon which the turnpike was to be built, were payable solely from revenue and not State funds. *Id.* at 59, 73 N.W.2d 544.

In *Alan v. Wayne County*, 388 Mich. 210, 200 N.W.2d 628 (1972), the *Supreme Court* followed the standards enunciated in *Rude* and *Dearborn*, in a case where suit was

brought to test the validity of certain bonds issued by the county to finance the construction of a stadium. While the matter was at issue in Wayne County Circuit Court, the Governor of the state requested that three questions be submitted for certification. The Supreme Court responded by assuming appellate jurisdiction, and thereafter held, *inter alia*, that the bonds in question were tax bonds, rather than revenue bonds, and were for such reason not authorized by the Building Authority Act, M.C.L.A. § 123.951 *et seq*; M.S.A. § 5.2731 *et seq*. In reaching this decision the court addressed the prefatory issue of whether or not the stadium authority was a county agency:

> Here the county's full faith and credit is pledged and we hold '*the Authority is [not] separate from the government and autonomous' but is acting as an alter ego.* This means the county is pledging its full faith and credit not only to pay the rent but also to pay the bonds, neither of which Acts 31 and 94 permit. *Id.* at 267, 200 N.W.2d 628. (Emphasis supplied).

In contrast to the standard followed in *Rude, Dearborn,* and *Alan,* is the service related, "control" test which guided the court in *Smith, Hinchman and Grylls Associates, Inc. v. River Rouge Public Building Authority,* 374 Mich. 514, 132 N.W.2d 682 (1965). There, the City of River Rouge was sued by a firm of architects for an amount claimed due on a contract for services rendered. The Wayne County Circuit Court entered a default judgment against the building authority and entered a judgment of no cause of action in favor of the city, from which plaintiff appealed. The Supreme Court reversed and held that the city, which had created the building authority to acquire land and construct a municipal building to house certain city offices, and had advanced to the authority rental payments, which the authority was authorized to expend for architectural services and office expenses, was competent to become liable for the obligations of the authority since the revenue bond issue was voted down at a referendum election, leaving the authority without funds to pay the

balance and the architect. In formulating this result, the Court reasoned:

> Plaintiff, recognizing that the authority is not the alter ego of the city, contends that it is nevertheless its agent and was such in incurring the obligation to plaintiff. *This we think supported by the meaning of the governing statute and by the extent of the city's control over the authority.* Not only did it create and incorporate the authority, but further, acting through the council, it appointed its 3-man commission, *its governing authority,* and also 2 directors, one the mayor and the other a councilman, to serve as liaison between council and authority; the authority had no right to do anything except acquire property, build facilities thereon for the city and ultimately convey same to the city; the authority had and could have no assets save those received from the city until its bonds were sold; the authority did nothing and entered into no contract with plaintiff until it was approved by the council. *The authority was under the complete control of the council, which approved plaintiff's contract, its plans and work. We think the purpose for which the authority was created and the extent of the city's control made the authority nothing more than an agent of the city.* We hold that the city, acting through its agent, the authority, made itself liable to plaintiff. Analogous, although not on all fours, and leading to this conclusion are *Herman v. Mobile House Corporation,* 317 Mich 233, 26 N.W.2d 757, and *City of Dearborn v. Michigan Turnpike Authority,* 344 Mich. 37, 73 N.W.2d 544. *Id.* at 522–523, 132 N.W.2d 682. (Emphasis supplied).

This is the standard which the Attorney General applied in rendering his opinion of December 7, 1976. There, it is noted that the Commissioner of Insurance, a state officer, is vested with the duty and responsibility to promulgate rules regulating the qualifications of employers to become employer-members of the State Accident Fund and to determine and levy appropriate premiums and assessments upon these employer-mem-

bers. The Attorney General also found as affirmative indicia of the state's control over the State Accident Fund the following: (1) although the statute requires the Accident Fund to be self-supporting, M.C. L.A. § 418.711; M.S.A. § 17.237(711), the Commissioner of Insurance and the State are by statute directly liable for the receipt and disbursement of the monies of the fund to the extent that the monies are paid into said fund, M.C.L.A. § 418.701; M.S.A. § 17.737(701); (2) the Commissioner of Insurance, despite the language of M.C.L.A. § 418.741; M.S.A. § 17.237(741), to the effect that the Advisory Board "may authorize" such help "as may be necessary", is specifically authorized to employ deputies, assistants and clerical help and the Commissioner is further authorized to remove them; (3) the Commissioner of Insurance, pursuant to M.C.L.A. § 418.751; M.S.A. § 17.237(751), is empowered to make the final judgment as to whether it is "necessary to dissolve the Accident Fund".

In addition to this application of the control standard, the Attorney General looked to a variation of this standard enunciated by the Supreme Court in *Advisory Opinion Re: Constitutionality of PA 1966, No. 346,* 380 Mich. 554, 571, 158 N.W.2d 416 (1968), where it is stated:

We must, as has been stated, look behind the name to the thing named. We must examine its character, its relation, and its functions to determine, indeed, whether it is an agency or instrumentality of State government. This examination leads us to a consideration of the purposes sought to be accomplished by the law. If those purposes are public purposes, if the work of the entity is a public work, then the state housing development authority is a state agency or instrumentality and its creation is a constitutional exercise of legislative power.

Applying this test to the enabling legislation which created the State Accident Fund, the Attorney General was of the opinion that the statute was in complete compliance therewith. At page 5 of his Opinion, the Attorney General wrote:

The Fund was created by the legislature; it has been delegated a portion of the sovereign power of government in that it has the power to make assessments of its members, including the State of Michigan; it has been conferred with certain powers, duties and discretion to be exercised under the supervision of the Insurance Commissioner, and it has exhibited permanency and continuity.

Thus, it is clear that the State Accident Fund is a state agency vested with the public purpose of providing worker's disability compensation insurance for state employers. As a state agency, the Fund is subject to the constitutional and statutory restrictions imposed on all state agencies; it is subject to control by the state legislature and supervisory control of the Insurance Commissioner, and it also receives certain benefits by virtue of being a state agency, such as the ability to utilize the services of the State Treasurer to hold, invest, and disburse its funds, and the right of its employees to be members of the State Employees' Retirement Fund. (Footnotes omitted).

After carefully considering the evolution of the statute creating the State Accident Fund, I am convinced that the "control" standard is the only appropriate test by which to judge whether the Fund is a state agency or instrumentality. The Accident Fund does not carry out its function by issuing bonds in order to raise revenue for a specified purpose, as these circumstances existed in *Rude, Dearborn,* and *Alan.* Indeed, the authorities in *Rude* and *Dearborn* were quasi-public agencies, not subject to the constitutional impediments of action under which their creating bodies were operating. Here, the State Accident Fund was not created to evade any such constitutional limitation. Rather, the Fund is merely providing a public service to employers in the State of Michigan pursuant to a clear expression of will by the legislature. Thus, since the legislature did not intend, either expressly or by implication, for the Accident Fund to be a separate, independent agency or for the Fund to incur financial liability in its own name or for the

State of Michigan, except as to its role as a fiduciary of deposited funds, the "alter ego" and "full faith and credit" standards have no application to the case at bar. Indeed, liability of the Accident Fund is not based on contract, but fixed by statute. See for example, *O'Meara v. Department of Agriculture*, 224 Mich. 666, 668, 195 N.W. 418 (1923).

■ Inasmuch as the instant question must be resolved in light of the "control" standard, I am of the opinion that the finding of the Attorney General is correct, i.e. the State Accident Fund is a state agency. The language of the statutory scheme creating the Accident Fund has, since 1912, evidenced an intent on the part of the legislature to vest with the Commissioner of Insurance an exceptional and pervasive degree of discretionary authority over all facets of the operation of this Fund, including, but not limited to, policymaking and personnel decisions. Inescapable, then, is the conclusion that the Accident Fund is not an autonomous agency existing apart from any exercise of control on the part of the State of Michigan or one of its officers. I concur with the following:

> Having determined that the State Accident Fund is a state agency, it is clear that the legislature may control the authority and operations of the Fund and may, if it chooses to do so, disband the operation of the Fund completely. Also, employees of the Fund are state employees and, as such, are within the classified State Civil Service, Const 1963, art 11, § 5, *DeMaggio v Attorney General*, 300 Mich 207 [251]; 1 NW 2d 530 (1942). (Opinion of the Attorney General, December 7, 1976, D–6).

■ In view of this determination, the issues left for resolution are few. First, Plaintiffs Elston-Richards Storage Company and Russell Jameson, holders of contracts of insurance issued by the Accident Fund, contend that they will be deprived of their property, the reserves and assets of the Accident Fund, without due process of law and have their contracts impaired. This claim is devoid of merit.

The assets of the Accident Fund are held in trust by the Treasurer of the State of Michigan for the benefit of the employer insureds. Consequently, these monies are not available for general or other purposes of the State of Michigan, nor are they subject to appropriation by the legislature. The assets of the Fund are, as a matter of fact, held in trust for the purpose for which they were intended. The clarification of the status of the Accident Fund does not deprive policyholders of their interest in the Fund, nor does it otherwise convert or divert the assets and reserves of the Accident Fund. Policyholders enjoy the same rights and privileges in the Fund as they did prior to the instant clarification. Hence, there is no deprivation of property and the policyholders due process rights are not infringed. Further, the policyholders' contracts are not impaired since the Accident Fund never was an independent and autonomous agency, despite the allegation of the Plaintiffs to the contrary, as it is well settled that statutes do not wither by disuse. *Washtenaw County Road Commissioners v. Public Service Commission*, 349 Mich. 663, 682, 85 N.W.2d 134 (1957).

Since its inception, the Accident Fund has been the subject of debate, sometimes referred to as a state agency and sometimes being thought of as an autonomous public benefit fund. Upon this indefinite background, policyholders nonetheless requested that the Accident Fund provide insurance coverage, not knowing for sure whether the Accident Fund was being run by state employees or non-state employees. Now that the question has been resolved, there is no logical argument to sustain a finding that state employees will not provide the same faith and credit to the policyholders' contracts as those policyholders expected when the Accident Fund's status was left open to question. Indeed, the Accident Fund's integrity has been enhanced by laying to rest this prolonged doubt relating to its operation.

Moreover, the powers, scope and structure of the Accident Fund are not being altered. Contracts of insurance are not be-

ing dishonored and it is readily apparent that their is no impending threat of such a sudden act occurring. Rather, the employees of the Accident Fund are only being classified as state employees, an adjustment that has no effect whatsoever on the policyholders of the Fund. There is, accordingly, no reason to believe that the contracts of insurance, presently held by the Accident Fund, will not be honored or that they will be impaired.

Finally, it must be remembered that the Accident Fund never was anything other than a state agency, regardless of the inconsistent line of opinions issued by a series of Attorney's General. The intent of the legislature in 1912 was to create a state agency, as evidenced by the powers and authority provided to the supervisor of that agency, the Commissioner of Insurance, and this intention was never altered in subsequent revisions of the enabling legislation. The fact that it has taken so much time for the State of Michigan to bring the agency into alignment with other state agencies is not compelling, since the expression of legislative intent must be considered paramount. The Accident Fund, thus being a state agency since its creation and its employees being, therefore, state employees, recognition of the Fund as a state agency does little more than state the obvious and cannot be cause for the obligations of existing insurance contracts to be impaired.

Secondly, Plaintiffs' Ward Ellison and Max Grost assert that they, and all other employees of the Accident Fund, will be deprived of the property interests they have accumulated in their continued employment and will suffer the impairment of their contracts of employment. In explication of this claim. Plaintiffs indicate at page 31 of their brief:

A further impairment of contractual obligations would occur as a result of classifying the present employee's as civil servants of the State of Michigan. This would deprive Plaintiffs Ellison and Grost and all other employees of the Michigan Accident Fund of their respective rights under their retirement plan, as provided for in ERISA.

Since, the Accident Fund is a state agency, the provisions of ERISA do not apply to a pension plan established by the State for its employees. Here, however, the State did not create the pension plan in question; rather, the Accident Fund employees, on their own initiative and the employer insureds, contracted to establish a pension plan *without the benefit of the State of Michigan.* Since this is a private pension plan, the State has no obligation to contribute to its maintenance as the Plaintiffs must look to the employer-insureds for such contribution. However, the Plaintiffs have alleged that the State has or will attempt to interfere with this private plan, thereby depriving the Plaintiffs of their interests therein. At the present time, it is unclear whether the State of Michigan, in bringing the Accident Fund employees into compliance with civil service guidelines, will terminate this separate pension plan. Accordingly, because of this uncertainty, a question of fact exists, and, therefore, summary judgment on this count would, at this time be inappropriate.

Based on the foregoing, Defendants' Motion for Summary Judgment is denied in part and granted in part.

## APPENDIX A

Chapter 7 of the Workers' Disability Compensation Act of 1969 provides:

Sec. 701. An accident fund is created to provide workmen's compensation insurance for employers under the supervision of the commissioner of insurance, herein referred to as the commissioner. Upon compliance with the rules concerning insurance adopted by the commissioner, membership in and coverage by the fund shall be provided to employers subject to this act who shall request such membership and coverage of the fund in writing. Thereupon the accident fund shall assume charge of levying and collecting from the employers such premiums or assessments as may be necessary from time to time to pay the sums which become due under the provisions of this act and also the

expense of administration; and shall disburse such sums in accordance with the provisions of this act. Neither the commissioner nor the state shall be liable or responsible for the payment of claims for compensation under the provisions of this act beyond the extent of the sums so collected and received.

Sec. 702. (1) If the southeastern Michigan transportation authority created pursuant to Act No. 204 of the Public Acts of 1967, as amended, being sections 124.401 to 124.425 of the Michigan Compiled Laws, or an authority created pursuant to Act No. 55 of the Public Acts of 1963, as amended, being sections 124.351 to 124.-359 of the Michigan Compiled Laws, ceases to operate or is dissolved, and a successor agency is not created to assume its assets, liabilities, and perform its functions, and if the authority is authorized to secure the payment of compensation under section 611(a), then the state hereby guarantees the payment of claims for benefits arising under this act against the authority.

(2) The accident fund shall determine in detail as the director of the department of management and budget may require the amount necessary to pay the claims for benefits for which the state is responsible pursuant to subsection (1). The accident fund shall be responsible for the processing of these claims.

(3) The state shall be entitled to a lien which shall take precedence over all other liens on its portion of the assets of the authority in satisfaction of the payment of claims for benefits under this section.

Sec. 705. There shall be maintained in the accident fund a sufficient amount of cash to pay current losses and expenses and the balance may be invested by the commissioner and the state treasurer acting together, in such securities as are specified by law for investment by casualty insurance companies. All securities shall be purchased and may be sold at such time, in such manner and in accordance with such rules and conditions as may be prescribed by the joint action of the commissioner and the state treasurer.

The commissioner shall give a good and sufficient bond in the sum of $25,000.00 executed by a surety company authorized to do business in the state, covering the collection and disbursement of all moneys that may come into his hands under the provisions of this act. The premium on the bond shall be paid out of the general funds of the state.

Sec. 711. The accident fund shall be neither more nor less than self-supporting and the premiums or assessments levied for such purpose shall be subject to readjustment by the commissioner as may become necessary.

Sec. 715. The commissioner may classify the establishments or works of such employers in groups in accordance with the nature of the business in which they are engaged and the probable risk of injury to their employees under existing conditions. He shall determine the amount of the premiums or assessments which employers shall pay the accident fund, may prescribe when and in what manner the premiums and assessments shall be paid, may change the amount thereof in respect to any or all of such employers as circumstances may require and the condition of the respective plants, establishments or places of work in respect to the safety of their employees may justify, but all such premiums or assessments shall be levied on a basis that shall be fair, equitable and just as among such employers.

Sec. 721. All premiums or assessments shall be due and payable within 45 days from the date on which the insurance became effective and formal demand for the payment of such premium shall be made within 30 days from that date. If any employer defaults in the payment of any premium or assessment required by the commissioner, the insurance of such employer shall become void and the sum due for the period insured shall be collected by an action at law in the name of the state as plaintiff which right of action is in addition to any other right of action or remedy.

Sec. 725. Every employer requesting insurance in the accident fund, upon complying with the rules concerning the insurance adopted by the commissioner, shall be furnished with a certificate showing the date on which the insurance becomes effective. The insurance shall be in force for a period of 1 year and may be renewed for subsequent periods of 1 year.

Sec. 731. Any controversy between the commissioner and an employer insured in the accident fund shall be subject to the review provided by law for controversies arising between insurance companies and insured employers. Any controversy between the accident fund and a claimant for benefits from the accident fund under the provisions of this act shall be determined in accordance with the provisions of this act in respect to controversies concerning compensation.

Sec. 735. The books, records and payrolls of each employer insured by the accident fund shall always be open to inspection by the commissioner or his duly authorized agent or representative for the purpose of ascertaining the correctness of the amount of the payroll reported, the number of men employed and such other information as the commissioner may require in the administration of the accident fund. Refusal on the part of any employer to submit books, records and payrolls for inspection shall subject the offending employer to a penalty of $50.00 for each offense, to be collected by civil action in the name of the state and paid into the accident fund, and the individual who personally gives the refusal is guilty of a misdemeanor. Any employer who knowingly submits to the commissioner a false statement of payroll for the purpose of securing a lower premium charge is guilty of a misdemeanor and shall be fined not less than $100.00 or imprisoned for not more than 30 days in the county jail, or both.

Sec. 741. The commissioner shall keep complete records of all business transacted by him in the administration of the accident fund. He may employ such deputies and assistants and clerical help as may be necessary and as the advisory board may authorize, for the proper administration of the accident fund and the performance of the duties imposed upon him by the provisions of this act, at such compensation as may be fixed by the advisory board and may also remove them. The commissioner and the deputies and assistants shall be entitled to receive their actual and necessary expenses while traveling upon the business of the accident fund. All salaries and expenses shall be charged to and paid out of the accident fund. The commissioner shall include in his annual report a full and correct statement of the administration of the accident fund, showing its financial status and outstanding obligations, the claims contested and why and general statistics in respect to it.

Sec. 745. All payments on account of injuries to employees from the accident fund shall be made in accordance with the provisions of this act and the rules of the bureau governing payment of compensation by carriers.

Sec. 751. If this chapter is repealed, or if in the judgment of the commissioner it becomes necessary to dissolve the accident fund, all moneys which are in the accident fund at such time shall be subject to disposition under the direction of the circuit court for the county of Ingham, with due regard to the obligation incurred and existing to pay compensation under the provisions of this act.

Sec. 755. An annual meeting of the employer-members of the accident fund shall be called by the commissioner in Lansing in October, which may be attended by the members in person or by a representative. Notice of the annual meeting shall be made by mail at least 10 days prior to the date of the meeting. At the annual meeting there shall be nominated by the members present 15 employer-members to constitute an advisory board, who, when certified to the governor, shall receive an appointment to serve for the term of 1 year. In case of vacan-

cy in the advisory board, a nomination may be made by the remaining members to the governor for the purpose of filling the vacancy. The advisory board shall elect 1 of its members chairman and 4 other members who, together with the chairmen, shall constitute an executive committee, which shall meet quarterly on the call of the chairman in Lansing. The advisory board shall advise the commissioner regarding the means and methods of administering the affairs of the accident fund. (Footnote omitted).