HERMAN *v*. MOBILE HOMES CORPORATION.

OWNBY *v*. SAME.

BIDIGARE *v*. SAME.

DUNCAN *v*. SAME.

HOEBERLING *v*. SAME.

1. CORPORATIONS—PARENT AND SUBSIDIARIES.

Where evidence showed that all the capital of subsidiary real estate and building corporations was provided exclusively by parent lumber company; latter furnished all credit necessary for their operations; all lumber and building supplies were purchased exclusively from parent; capital of building corporation was grossly inadequate for nature of undertaking; officers, directors and employees of parent or sons of its president and rendered gratuitous services to them in normal course of business; policies were largely determined by parent's president; all three had common business address; one subsidiary was operated for convenience and without profit and the other apparently at a loss; correspondence indicated parent company regarded their business as its own and received complaints from purchasers of houses from them and had repairs made by its own workmen; the subsidiaries had no independent existence separate and apart from parent corporation.

2. SAME—LIABILITY OF PARENT FOR CONTRACTS OF SUBSIDIARY.

In determining whether the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is *sui generis* and must be decided in accordance with its own underlying facts.

Capacity of corporation to act as an agent, see 1 Restatement, Agency, § 21, comment a.

3. SAME—PARENT AND SUBSIDIARY—PRINCIPAL AND AGENT.

Dominion of a parent corporation over its subsidiary may be so complete, and interference so obtrusive, that by the general rules of agency, the parent will be a principal and the subsidiary an agent.

4. SAME—PARENT AND SUBSIDIARY—PREJUDICE OF THIRD PARTIES.

If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to limit such abuse of the corporate capacity or shield.

5. SAME—INTERFERENCE BY HOLDING COMPANY IN MANAGEMENT OF SUBSIDIARY—OBLIGATIONS OF SUBSIDIARIES.

Where a holding company directly intervenes in the management of its subsidiaries so as to treat them as mere departments of its own enterprise, it is responsible for the obligations of those subsidiaries, incurred or arising during its management.

6. SAME—PARENT LUMBER COMPANY—SUBSIDIARY REAL ESTATE AND BUILDING CORPORATIONS—LIABILITY OF PARENT TO THIRD PARTIES.

Parent lumber company's domination and control of subsidiary real estate and building corporations *held*, so complete as to make latter ''mere departments'' or instrumentalities and adjuncts of the parent, hence latter was responsible for their contractual obligations to third parties.

7. COSTS—CONSOLIDATED CASES.

Upon affirmance of judgments in five cases consolidated, tried without a jury, appealed on one record and which involve substantially similar questions of fact and law, costs may be recovered in only one case.

Appeal from Wayne; Brennan (John V.), J. Submitted January 14, 1947.. (Docket Nos. 33–37, Calendar Nos. 43,504–43,508.) Decided April 8, 1947.

Separate actions of assumpsit by Ralph J. Herman and wife, Dale Ownby and wife, Harry C. Bidigare and wife, Francis P. Duncan and wife, and Carl Hoeberling and wife against Mobile Homes

Corporation and others for damages caused by defective construction of homes they had purchased. Cases consolidated for trial and appeal. Judgments for plaintiffs. Defendant Currier Lumber Company appeals. Affirmed.

*Robert F. Robbins,* for plaintiffs.

*Fildew & DeGree,* for defendant.

BUTZEL, J. The respective plaintiffs purchased very simple new houses and lots, each for a consideration in the neighborhood of $4,600, in one of the "Stephenson" subdivisions, Oakland county, Michigan, not far from the city of Detroit. Very shortly thereafter each house showed serious defects due to inferior materials or workmanship, or both. In some, if not all, the roofs leaked, paint peeled off, cellar floors cracked and separated, plumbing appeared defective, et cetera. On appeal, there is no claim that the defects were not proven or that the damages were excessive. Respective plaintiffs each brought a separate suit against the Currier Lumber Company, and its subsidiaries, the Inter Urban Land Company and the Mobile Homes Corporation. The cases were consolidated, tried without a jury and judgment rendered against all the defendants in sums amounting to $635 each in four cases and $795 in the fifth case. The cases have been appealed on one record. They involve substantially similar questions of fact and law.

In the declarations the plaintiffs alleged representations made to them that the houses were built in good workmanlike manner and according to the Federal housing administration's requirements, and that these representations were untrue; that while

the actions sounded in tort, plaintiffs waived.it, and brought suit in assumpsit. They added the common counts.

The trial judge found that while plaintiffs failed to prove fraud, they did establish a breach of contract on the part of the different subsidiaries; that the latter were so completely controlled and dominated by defendant Currier Lumber Company as to make each of them the mere instrumentality, agent or adjunct of the lumber company; that the subsidiaries had no independent existence but were mere instrumentalities through which the lumber company acted.

The Currier Lumber Company, a Michigan corporation, the parent corporation, was organized in 1927 for the purpose of buying and selling lumber and building supplies. It is referred to herein as the Currier Company. Two subsidiaries were created in 1941: the Inter Urban Land Company, which was incorporated for the purpose of dealing in real estate, and the Mobile Homes Corporation, which was incorporated for the purpose of engaging in a general building business. The president and controlling stockholder of the Currier Company is Patrick J. Currier. The directors of the parent corporation are: Patrick J. Currier, president, Theodore G. Navarre, secretary, and John W. Olsen, auditor. The stock of Inter Urban Land Company was held by Donald F. Currier, son of the president of the parent company, who subsequently transferred it to Currier Company but was given a proxy to vote all of the 2,000 shares outstanding. The directors of that subsidiary corporation were: Donald F. Currier, Vincent J. Currier, another son of Patrick Currier, William D. Block, an employee of the parent company, and Theodore Navarre, secretary of the parent corporation. All of the stock

of Mobile Homes Corporation was held by Vincent J. Currier, although the money therefor was advanced by Currier Company. The directors of that subsidiary were: Vincent Currier, Donald Currier, William Block and Theodore Navarre. All three corporations conducted their business at the same address; *viz.*, 17507 Van Dyke avenue, Detroit, Michigan.

It is undisputed that all of the capital, financing and credit required by the two subsidiaries was provided exclusively by the parent corporation. The original issue of capital stock in the Mobile Homes Corporation, 50 shares at $100 per share, was subscribed for in its entirety by Currier Company. During the comparatively short period of its existence, from August 5, 1941, when it was incorporated until its dissolution on May 8, 1943, the Mobile Homes Corporation received from Currier Company a credit of approximately $1,000,000 for lumber and building materials all of which were purchased from the parent company, and approximately $100,000 in cash, advanced to Mobile Corporation to meet its payroll. As this subsidiary sold houses, it applied the purchase price money received therefor upon its obligations to the parent company. When it was dissolved in May, 1943, Mobile Corporation owed Currier Company approximately $90,000, which debt was written off by Currier Company.

In 1941 Mobile Corporation entered into a land contract with the Stephenson Land Company, not a party to this litigation, to purchase a subdivision known as the ''Stephenson Subdivision,'' heretofore referred to, and made a down payment thereon. Subsequently, Mobile Corporation sold and assigned its equity in the land contract to Inter Urban Land Company with an option back which would permit

Mobile Corporation to repurchase any of the lots in the subdivision at cost within one year's time. The explanation is offered that this device was utilized to enable Inter Urban to carry the contract and thus reduce the need of Mobile Corporation for additional capital. Inter Urban acquired title to the subdivision, presumably with the $88,000 advanced to it by Currier Company, which accepted the notes of Inter Urban for that amount. Thereupon Mobile Corporation began to exercise its option and paid Inter Urban the cost price for each lot it repurchased. When Mobile Corporation sold a house and lot, however, a deed was executed by Inter Urban running directly to the purchaser without the intervention of Mobile Corporation, notwithstanding that the purchase agreements were usually with Mobile Corporation or with Defense Housing Company, real estate brokers for the Stephenson project.

During the year 1942 each of the plaintiffs herein purchased a newly-constructed house from the subsidiaries of Currier Company. The deeds were made out to plaintiffs by the Inter Urban Land Company; the purchase agreements were with Mobile Homes Corporation, with the exception of those made with plaintiffs Bidigare and Hoeberling in which the Defense Housing Company, real estate brokers, is indicated in the agreement as the seller. The purchase agreements all contained the following uniform provisions:

"All construction to have been completed to the satisfaction of the Federal Housing Administration and in conformity with the local and State building code or requirements. * * *

"Final payment from proceeds from the mortgage upon approval of final F.H.A. inspection, or whatever other additional evidence of satisfactory completion and title may be required according to the judgment of the mortgagee."

It is undisputed that the Federal housing administration made three routine inspections of each of the houses during the various stages of construction which, according to an employee of that agency, is customary. It is also undisputed that each of the plaintiffs were shown through their respective houses and had an opportunity to inspect them prior to entering into their purchase agreements. The record establishes the fact, however, that the construction of these houses was faulty; and that it was only a matter of two or three weeks in some cases to two or three months in others before the defects began to appear.

Plaintiffs initially addressed their complaints to Currier Company which did not deny its interest or liability but, on the contrary, sent out its workmen in its own trucks to attempt to repair some of the defects. These attempts at repair having proved unsatisfactory in most cases, plaintiffs addressed their complaints to the Federal housing administration. Correspondence from the F.H.A. to Mobile Homes Corporation with regard to the necessity of repairs on these houses were answered by officers of the Currier Company on the letterhead stationery of the latter company. In its replies to the F.H.A., Currier Company did not deny its interest in the Stephenson building project or its liability for the defects in construction concerning which plaintiffs were protesting to the F.H.A. These efforts having proved unavailing, plaintiffs instituted the instant actions in January, 1944.

The following circumstances clearly establish the fact that both subsidiary corporations were completely controlled and dominated by Currier Company and had no independent existence separate and apart from the parent corporation:

1. All of the capital of the two subsidiaries was provided exclusively by the parent company;

2. All of the credit necessary for the operations of the subsidiaries was provided exclusively by the parent company, which in the case of Mobile Homes Corporation amounted to approximately $1,000,000;

3. Mobile Homes Corporation purchased all of its lumber and building supplies exclusively from the parent company;

4. The capital of Mobile Homes Corporation was grossly inadequate for the nature of the undertaking. Mobile Corporation was originally capitalized for $5,000 and immediately embarked upon a project which required a credit of $1,000,000;

5. The officers and directors of the subsidiaries were the officers and directors or the employees of the parent and the sons of the president of the parent company;

6. Officers and employees on the payroll of the parent company rendered gratuitous services to the subsidiaries in the normal course of business; *e.g.,* Olsen, who as auditor of the Currier Company also audited the books of Mobile and Inter Urban without any additional compensation;

7. The parent company handled the payroll of Mobile Corporation;

8. The policies and decisions of the subsidiaries were determined largely by Patrick J. Currier, president of Currier Company;

9. The offices and business of all three corporations were carried on at the same business address;

10. Inter Urban Land Company was operated as a mere convenience and received no profit whatsoever;

11. Upon the completion of the project, Mobile Homes Corporation, which was still indebted to the parent company to the extent of approximately $90,000, was dissolved. The debt was written off by both companies;

12.   Correspondence on the letterhead of Currier Company signed ''Currier Lumber Company'' by its advertising manager, indicates that Currier Company regarded the Stephenson subdivision project as its own:

A letter addressed to Mrs. M. M. Evans, one of the real estate brokers associated with the promotion of the building project, contains the following:

(1) ''I am submitting to you certain information with regard to the houses in the Stephenson project and clarifying certain matters of sales policy which *we* have established.   *   *   *

(2) ''In setting up *our* project with the F.H.A *we* have made the Defense Housing Company *our* selling agent.   *   *   *

(3) ''I am sure you realize that in an operation of this size in which nearly a million dollars of the Currier Lumber Company's money is invested, *we* must have some specific rules on which there can be no exception.''

Another letter to Mrs. Evans stated:

(1) ''*We* cannot promise any delivery date on houses   *   *   *   *we* have arrived at a compromise policy, whereby, *we* will inform the purchaser   *   *   *   *we* will arrive at a delivery date for the house.   *   *   *

(2) ''A price increase on the houses is due next Monday, March 30.   This increase will probably be $200 on all houses except those having plain roofs.   *We* will inform you definitely of the date upon which this change becomes effective.''

A third letter to Mrs. Evans stated that:

(1) ''*We* have found it necessary *   *   *   to readjust slightly certain prices in the Mobile Homes Project at Stephenson Highway.   *   *   *

(2) "*We* feel that these adjustments of price are so slight as to have no effect on sales. On the contrary, *we* feel that these changes give us a more logical spread of prices   *  *  *  " et cetera;

13. Another letter also on Currier Company's letterhead was addressed to Mrs. Evans and signed "Currier Lumber Company," P. J. Currier, President, in which it is stated:

a. "A recent survey of *our* sales record in the Stephenson Highway project shows that in the past 60 days, only four purchase agreements have been turned in by your office on project houses.   *  *  *

b. "Obviously, this sales record does not justify the use of a model. *We,* therefore, regret very much that *we* must ask you to vacate this model as quickly as possible;"

14. Correspondence addressed by the Federal housing administration to "Mobile Homes, Inc., 17507 Van Dyke avenue, Detroit, Michigan," would be answered and signed by "Currier Lumber Company, Secretary;"

15. Correspondence directed to plaintiffs relative to their complaints were signed "Currier Lumber Company, T. Navarre, Secretary;"

16. An agreement was introduced between Carl Hoeberling and wife, plaintiffs, and Currier Company itself wherein Currier Company agreed to erect a garage at a cost of $460 for the Hoeberlings, who had purchased one of the Stephenson project houses. It is noted that the agreement bears the date of July 8, 1942, at which time Mobile Homes Corporation was still in being and active, that corporation not having been dissolved until May 8, 1943. It thus appears that although appellants claim Currier Lumber Company only bought and

sold lumber, it also engaged in the building busi- ness;

17. Complaints were frequently made by plaintiffs directly to the Currier Company regarding defects in the houses, which resulted in some superficial repairs being attended to by workmen who arrived in Currier Company's vehicles and identified themselves as Currier Company employees.

In determining whether the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is *sui generis* and must be decided in accordance with its own underlying facts. *Fish* v. *East* (C. C. A.), 114 Fed. (2d) 177, 191; *Centmont Corp.* v. *Marsch* (C. C. A.), 68 Fed. (2d) 460, 463; *Industrial Research Corp.* v. *General Motors Corp.* (C. C. A.), 29 Fed. (2d) 623, 626.

Appellants rely largely on *Gledhill* v. *Fisher & Co.*, 272 Mich. 353, 357 (102 A. L. R. 1042), wherein this Court stated:

"Before the corporate entity may be properly disregarded and the parent corporation held liable for the acts of its subsidiary, * * * it must be shown not only that undue domination and control was exercised by the parent corporation over the subsidiary, but also that this control was exercised in such a manner as to defraud and wrong the complainant, and that unjust loss or injury will be suffered by the complainant as the result of such domination unless the parent corporation be held liable."

The fact situation in *Gledhill* v. *Fisher & Co.*, *supra*, was far different from that in the instant case. In that case, a realty company, referred to as the vendee, was organized by the New Center Development Corporation, a subsidiary of Fisher & Company. The development corporation fur-

nished the capital for the vendee, the officers of
which were nominated by the development corpora-
tion and its parent, Fisher & Company, which was
engaged in the investment business. The vendee
corporation purchased a parcel of property on land
contract from Gledhill. The purchase price was
$125,000, almost $25,000 of which had been paid the
vendor when the depression set in with its accom-
panying deflation in real estate values; whereupon
the vendee corporation and Gledhill agreed to cancel
the contract, Gledhill retaining the property and all
sums that had already been paid on the contract.
Subsequently, Gledhill learned for the first time of
Fisher & Company's interest and brought suit to
have the contract reinstated, alleging that the can-
cellation agreement had been procured by fraud on
the part of defendants. We held there was no liabil-
ity inasmuch as there was no fraud in the purchase
of the property by the subsidiary without a disclo-
sure of the ownership of its capital stock, nor did
the record indicate that the vendor had placed any
reliance upon the fact that Fisher & Company had
an interest in the vendee corporation. Such is not
the situation in the instant case wherein the parent
corporation so completely overshadowed its sub-
sidiaries as to leave no doubt but that the latter
were created as mere instrumentalities or adjuncts
for the activities of the former. Notwithstanding
the finding of the lower court that there was no
actual fraud on the part of defendant Currier Com-
pany, there is to be found in the record a recurring
element of Currier Company's recognition and ac-
knowledgment of its own responsibility to plaintiffs
which was entirely lacking in *Gledhill* v. *Fisher &
Co., supra.*

In *Berkey* v. *Third Avenue Railway Co.,* 244 N. Y.
84 (155 N. E. 58, 50 A. L. R. 599), the defendant

prevailed, but Chief Justice Cardozo, writing for the court, stated the rule as follows:

"Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice (Ballantine, Parent & Subsidiary Corporations, 14 California Law Review, 12, 18, 19, 20). The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law (*Chicago, M. & St. P. R. Co.* v. *Minneapolis Civic & Commerce Assn.*, 247 U. S. 490 (38 Sup. Ct. 553, 62 L. Ed. 1229); *United States* v. *Reading Company*, 253 U. S. 26, 61, 63 [40 Sup. Ct. 425, 64 L. Ed. 760]). At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form."

Professor Ballantine in his article on Parent and Subsidiary Corporations, 14 California Law Review, 12, 18, states:

"It is submitted that no mechanical rule based on objective facts of control or connection which will furnish a certain test is possible of formulation. Identity of stockholders, identity of officers, the manner of keeping books and records, the methods of conducting the corporate business as a separate concern or as a mere department of the other concern, may be evidential facts to be considered as bearing on the question of juggling of separate capacities and whether the subsidiary is being man-

aged in such a way as to make the controlling corporation justly responsible. But after all it comes down to a question of good faith and honesty in the use of the corporate privilege for legitimate ends. If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to limit such abuse of the corporate capacity or shield.''

In *Tennessee Consolidated Coal Co.* v. *Home Ice & Fuel Co.,* 25 Tenn. App. 316, 321 (156 S. W. [2d] 454, 458), the court observed that:

''It is not necessary for one to show that he has been misled, deceived or actually defrauded, to enable him to invoke this rule. It is enough that the parent corporation's domination of the subsidiary was so complete as to make the subsidiary a mere tool, agency or instrumentality of the parent; and that he will suffer loss unless the parent be held.''

Applying this rule in *Consolidated Rock Products Co.* v. *DuBois,* 312 U. S. 510 (61 Sup. Ct. 675, 85 L. Ed. 982), Mr. Justice Douglas, writing for the United States Supreme Court, observed:

''All management functions of the several companies were assumed by Consolidated. The subsidiaries abdicated. Consolidated operated them as mere departments of its own business. Not even the formalities of separate corporate organizations were observed, except in minor particulars such as the maintenance of certain separate accounts. In view of these facts, Consolidated is in no position to claim that its assets are insulated from such claims of creditors of the subsidiaries. To the contrary, it is well settled that where a holding company directly intervenes in the management of its subsidiaries so as to treat them as mere depart-

ments of its own enterprise, it is responsible for the obligations of those subsidiaries incurred or arising during its management. *Davis* v. *Alexander,* 269 U. S. 114, 117 (46 Sup. Ct. 34, 70 L. Ed. 186); *Joseph R. Foard Co.* v. *Maryland,* 135 C. C. A. 497, 499 (219 Fed. 827, 829); *Stark Electric R. Co.* v. *M'Ginty Contracting Co.,* 151 C. C. A. 507, 511–513 (238 Fed. 657, 661–663); *The Willem Van Driel, Sr.,* 164 C. C. A. 147, 149–151 (252 Fed. 35, 37–39); *Luckenbach S. S. Co.* v. *W. R. Grace & Co.* (C. C. A.), 267 Fed. 676, 681; *Costan* v. *Manila Electric Co.* (C. C. A.), 24 Fed. (2d) 383; *Kingston Dry Dock Co.* v. *Lake Champlain Transp. Co.,* 31 Fed. (2d) 265, 267; *Dillard & Coffin Co.* v. *Richmond Cotton Oil Co.,* 140 Tenn. 290 (204 S. W. 758).''

The record in the instant case indicates that the Inter Urban Land Company and Mobile Homes Corporation were operated as ''mere departments'' of the Currier Company. The trial court, notwithstanding the lack of actual fraud, properly found the parent company's domination and control so complete as to make the short-lived subsidiaries the mere instrumentalities and adjuncts of the Currier Company and correctly held the latter responsible for their contractual obligations to plaintiffs.

Judgment affirmed, with costs to plaintiffs; costs, however, to be recovered in only one case.

CARR, C. J., and BUSHNELL, SHARPE, BOYLES, REID, NORTH, and DETHMERS, JJ., concurred.