**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0473n.06

**No. 08-1942**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **RICHARD ROGEL**, Individually and as Trustee of the Richard H. Rogel Revocable Living Trust, U/A/D March 21, 1990 as amended in part on March 19, 1992, as amended and restated on November 10, 1994, and as further amended on April 13, 1997, | ) ) ) ) ) ) | |
| *Plaintiff-Appellee*, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| **MAX DUBRINSKY**, in his capacity as the Personal Representative of the Estate of Max Dubrinsky (deceased) and as Trustee of the Max Dubrinsky Living Trust, U/A/D August 10, 2003 as amended, | ) ) ) ) ) | **O P I N I O N** |
| *Defendant*, | ) ) | |
| and | ) ) | |
| **FREDERIC I. KEYWELL**, | ) ) | |
| *Defendant-Appellant*. | ) | |

FILED
**Jul 08, 2009**
LEONARD GREEN, Clerk

**BEFORE:** COLE and ROGERS, Circuit Judges; GRAHAM, District Judge.[*]

**COLE, Circuit Judge.** Defendant-Appellant Frederic Keywell appeals a grant of summary

judgment in favor of Plaintiff-Appellee Richard Rogel. Rogel sued Keywell and Mark Dubrinsky

(who is now deceased and whose estate has not appealed) under Michigan common law for

---

[*] The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

contribution of their pro rata shares of a debt that each of them had guaranteed but that Rogel repaid on his own. The debt at issue was incurred by Executive Hotel Group, LLC ("Executive"), a Michigan corporation the three men formed through their own intermediate business entities. Executive was governed by an Operating Agreement (also referred to herein as the "Agreement") signed in the names of the three business entities. The Agreement contained a limitation on the entities' ability to sue one another for contributions of additional capital, and Keywell argues that this limitation prohibits Rogel from bringing the instant suit. For the following reasons, we **AFFIRM** the grant of summary judgment for Rogel.

## I. BACKGROUND

### A.    Factual background

In early 1997, Dubrinsky and Keywell, citizens of Michigan, and Rogel, a citizen of Colorado, undertook a business venture developing economy hotels. To carry out the plan, each man first formed his own business entity: Rogel formed a single-member LLC (the "Rogel Entity"), and Dubrinsky and Keywell each formed a limited partnership (the "Dubrinsky Entity" and the "Keywell Entity") (collectively, the "entities" or "member entities"). The three entities then entered into an Operating Agreement forming Executive and governing its operation. The three entities were the members of Executive, and the Operating Agreement was signed in their names, not in the names of Keywell, Dubrinsky, and Rogel as individuals.

The funding for the project was to be a line of credit obtained from a bank, and the Agreement was conditioned upon Executive's ability to secure such funding. Executive succeeded in securing a $15 million line of credit with Comerica Bank, and Keywell, Dubrinsky, and Rogel all

signed personal guaranties on the line of credit, as required by Comerica.[1] Only Rogel pledged personal assets to secure the loan. Executive drew on the line of credit (in an amount not stated in the record), and in 2004 Comerica began requiring annual payments of $2 million as a condition for extending the loan. According to Rogel's Complaint, when Executive failed or refused to pay the amounts due within the time required, Comerica demanded repayment under the guaranties, and Rogel paid the $2 million due each year. He requested reimbursement from Keywell and Dubrinsky for their pro rata shares, but they refused. Rogel then filed this suit under Michigan common law, which provides for an implied right of contribution among joint guarantors. As of the time of briefing before this Court, Rogel had made $8 million in payments to Comerica.

## B. The Operating Agreement

Keywell's defense to Rogel's suit rests on a particular provision of the Operating Agreement in which the member entities agreed not to pursue legal action against one another for refusing to contribute additional capital to Executive under certain circumstances. The provision is found in Section 2 of the Operating Agreement, entitled "Capital Contributions, Company Percentages and Related Matters." Section 2.3 governs "Financing, Additional Capital Contributions and Related Provisions." Section 2.3(a) sets forth the requirement that a line of credit be obtained for the Agreement to be deemed effective (it also contemplates the possibility that Keywell, Dubrinsky, and Rogel would personally guarantee the line of credit). Section 2.3(b) is entitled "Additional Capital Calls" and is divided into two sections, one dealing with capital calls "For New Economy Hotels,"

---

[1]The parties refer to a $15 million line of credit, although the guaranty documents refer to a $20 million line of credit.

and one dealing with capital calls "For Development and Operating Deficiencies." The latter portion, section 2.3(b)(ii), allows a member, such as the Rogel Entity, to send a "Capital Call Notice" when it believes that additional capital is needed for purposes such as to complete construction of a hotel when costs are higher than expected, "to meet [Executive's] obligations in a timely manner," or "for any other reasonable purpose whatsoever." (ROA 49.) Section 2.3(c)(ii) deals with "Defaults" by the members on capital calls. It states that the Company will only be allowed to sue members for failing to provide capital in response to a capital call if the purpose of the call was to raise money to cover unexpected cost overruns in certain specified situations. Otherwise, the Agreement provides that legal redress is not available against a defaulting member; rather, a member who issues a capital call that another member chooses not to honor has the option of loaning the defaulting member's share to the Company and receiving repayment of that amount, with interest, over a five-year period. The Operating Agreement further states:

> Except to the extent expressly contemplated in this Section 2.3(c)(ii), no Defaulting Member shall be penalized in any way for failing to deliver all or any portion of its Share of the additional capital in question, and *neither the Company nor any Member shall* have the right to cause a Defaulting Member to deliver its Share of the additional capital in question or *have any remedy against any Defaulting Member for any failure to deliver all or any portion of its Share of the additional capital in question* . . . .

(ROA 50-51 (emphasis added).) Keywell argues that the language italicized above bars Rogel from suing the other members to recover their pro rata shares of the money Rogel paid to Comerica under his personal guaranty of the line of credit.

## C.     The district court's decision

Rogel, in his individual capacity, filed suit against Keywell and Dubrinsky in their individual capacities seeking contribution of their respective shares of his payments to Comerica. In lieu of an answer, Keywell and Dubrinsky filed a motion for summary judgment, arguing that the Operating Agreement expressly prohibited any member of Executive from seeking contribution from the other members for additional capital contributed to the company. Rogel opposed the motion and also moved for summary judgment, arguing that the Agreement applied only to the three business entities that were the parties to the Agreement. In reply, Keywell and Dubrinsky urged the district court to disregard the fact that neither they nor Rogel, as individuals, were parties to the Operating Agreement.

The summary judgment motions were referred to a magistrate judge, who found that the Operating Agreement applied only to the business entities. Seeing no reason to pierce the corporate veil and apply the Agreement to the individual guarantors, the magistrate judge recommended that Rogel's motion for summary judgment be granted. The district court largely adopted the Report and Recommendation and granted summary judgment to Rogel, finding that Keywell and Dubrinsky could not meet the second and third prongs of Michigan's veil-piercing test. The district court was

> convinced that there is no reason to disregard the legal distinctions purposely created between the Entities and the parties to this suit. Each of the parties to this suit signed the Comerica debt guaranty in [his] individual capacity . . . . There is no reference to the Entities in the guaranty. The Executive Hotel Operating Agreement clearly distinguishes between these individuals and the created Entities. Moreover, the detailed nature of the Executive Hotel Operating Agreement demonstrates that the documents were carefully drafted. These carefully drafted documents reflect a deliberate plan to have distinct legal bodies serve as guarantors of the Comerica debt and as members of the Executive Hotel Group.

(ROA 347.) The district court ordered Keywell and Dubrinsky to reimburse Rogel for their shares of his payments to Comerica. Dubrinsky died after the judgment was entered, and an amended judgment named the representative of his estate. Only Keywell has appealed.

## II. ANALYSIS

Keywell concedes that an action for an implied right of contribution would normally be available to Rogel under Michigan law, but he asserts that the Operating Agreement overrides this common law right. *See Wilmarth v. Hartman*, 213 N.W. 73, 74 (Mich. 1927) (recognizing that guarantors can—amongst themselves—contract out of the common law default rule of contribution). Keywell argues that we should pierce the corporate veil and hold that the restrictions on the Rogel Entity's ability to bring suit under the Agreement also bind Rogel himself and that the protections from suit the Agreement provides to the Keywell Entity also protect Keywell as an individual.

## A. Standard of review

We review a grant of summary judgment de novo. *See Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) and Fed. R. Civ. P. 56(c)). "The movant has the burden of showing that there is no genuine issue of fact, but . . . a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## B.     Piercing the corporate veil

We recently described Michigan's corporate-veil-piercing jurisprudence as follows:

Under Michigan law, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, [] 537 N.W.2d 221, 224 (Mich. 1995) (citing *Herman v. Mobile Homes Corp.*, [] 26 N.W.2d 757, 761 (Mich. 1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id.* (alteration in original) (quoting *Wells v. Firestone*, [] 364 N.W.2d 670, 674 (Mich. 1984)). Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Foodland Distribs. v. Al-Naimi*, [] 559 N.W.2d 379, 381 (Mich. Ct. App. 1996) (citing *SCD Chem. Distribs., Inc. v. Medley*, [] 512 N.W.2d 86, 90 (Mich. Ct. App. 1994)); *see also Gledhill v. Fisher & Co.*, [] 262 N.W. 371, 372 (Mich. 1935). The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven. *Kline v. Kline*, [] 305 N.W.2d 297, 299 (Mich. Ct. App. 1981) (per curiam); *see Herman*, 26 N.W.2d at 761 ("In determining whether the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is sui generies [sic] and must be decided in accordance with its own underlying facts.").

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd*, 475 F.3d 783, 798-99 (6th Cir. 2007).

Although "[t]he traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations," *Foodland Distribs.*, 559 N.W.2d at 381, "Michigan courts have [also] recognized that it may be appropriate to invoke the doctrine for the benefit of a shareholder where the equities are compelling." *Wells v. Firestone*, 364 N.W.2d at 674. In no instance, however, has a Michigan court invoked the doctrine for both of these reasons in the same case; that is, no Michigan court has pierced the veil to hold one

shareholder-party liable for the obligations of its corporate entity while piercing the veil of a separate entity for the benefit of the opposing shareholder-party.

### 1.    Mere instrumentalities

The district court found it unnecessary to resolve this factor, noting that Keywell could not meet the second and third prongs of the analysis. Because we agree with the district court, we also need not resolve this prong. We note that doing so would require us to determine both whether the Rogel Entity was a mere instrumentality of Rogel, and whether the Keywell Entity was a mere instrumentality of Keywell.

### 2.    Fraud or wrong; unjust loss

Under the second and third prongs of the veil-piercing analysis, Keywell must show that Rogel used the corporate form to perpetrate a fraud or wrong and that Keywell suffered an unjust loss as a result. Keywell cannot satisfy these prongs.

Keywell and Dubrinsky were sophisticated businessmen represented by counsel when they entered into the Operating Agreement. They created distinct corporate entities with the intent that those entities would be the parties to Executive's Operating Agreement. When Keywell, Dubrinsky, and Rogel guaranteed the line of credit with Comerica, they were well aware that they were acting in their individual capacities. In fact, they were aware of the possible necessity of personally guaranteeing the line of credit at the time they signed the Operating Agreement (on behalf of their respective entities), as section 2.3(a) of the Agreement expressly contemplates that the guaranties would be made by the three men as individuals. By their terms, both the obligations and the

protections contained in the Operating Agreement apply to the member entities themselves, not the individual owners of those entities.

In seeking contribution from Keywell and Dubrinsky, Rogel did not commit a wrong of the type that Michigan courts have found will justify corporate veil-piercing, if, indeed, he committed a wrong at all. While a breach of contract can satisfy this prong of the test, *see Servo Kinetics*, 475 F.3d at 799-800, Rogel was not a party to the contract, so he cannot have breached it. Nor can Keywell claim that a contract to which he was a party was breached. Keywell relies heavily on *Montgomery v. Central National Bank & Trust Co. of Battle Creek*, 255 N.W. 274, 274 (Mich. 1934). In that case, the plaintiff was the owner of nearly all of the shares of a company that operated a Tavern (the "Tavern Company"), and the Michigan Supreme Court allowed her, in her individual capacity, to sue to enforce a contractual clause that would not have been enforceable absent veil-piercing. The plaintiff had sold the lot across from the Tavern to the defendant using a sale-contract that contained a promise not to open a competing establishment on the lot. The defendant promptly breached the promise, arguing that a restriction on the use of land "may not be made in favor of one not a party to the instrument." *Id*. at 275. The *Montgomery* Court, while acknowledging this general rule, was willing to "ignore the separate entity of [the] corporation, and to look to the sole owner of its capital stock as the real party in interest" in order to prevent an obvious injustice and frustration of the clear intent of the parties. *Id*. at 275-76 (internal quotation marks omitted).

We are not persuaded that *Montgomery* supports disregarding the corporate distinctions in this case. The *Montgomery* Court pierced only a single veil and might have reached a different outcome if an additional veil-piercing had been required to not only make the contract enforceable

by the plaintiff but also to make it enforceable against the defendant. Furthermore, the equities of the *Montgomery* case clearly weighed in favor of piercing the veil, while here, it is uncertain that Keywell would be entitled to the result he is seeking even if the veil were pierced: the Agreement's limitation on capital-call-collection-suits does not clearly or explicitly extend to suits for contribution under the individuals' line-of-credit guaranties.

Other cases in which Michigan courts have pierced the corporate veil have uniformly required the disregarding of only one corporate entity, and have also presented more compelling equitable interests than those asserted here. *See, e.g.*, *Wells*, 364 N.W.2d at 674 (disregarding corporate distinction between employer and subsidiary where allowing suit would have contravened public policy behind workers' compensation statute); *Cinderella Theatre Co., Inc. v. United Detroit Theatres Corp.*, 116 N.W.2d 825, 826 (Mich. 1962) (piercing corporate veil to prevent lessor from avoiding contractual obligations by assigning lease to undercapitalized subsidiary); *Om-El Export Co. Inc. v. NewCor, Inc.*, 398 N.W.2d 440, 444 (Mich. Ct. App. 1986) (not requiring individual to mitigate damages by deducting his own wages from the corporation's recovery for breach of contract where contract clearly contemplated his personal services and he was the whole owner of the corporation).

Thus, even if Keywell and Dubrinsky intended to shield themselves from the obligation to pay Rogel for their shares of the loss of his pledged assets in the event that Executive defaulted on its line-of-credit debt—an intention that is not clearly set forth in the Agreement—they were not parties to the Operating Agreement, and Michigan law does not support disregarding these carefully

constructed corporate entities, as would be necessary to extend to Keywell any protections the

Keywell Entity enjoyed under the Agreement.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the grant of summary judgment in favor of Rogel.