*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FRATERNAL ENTERPRISES, INC., and BLUE BAY SOUTH LLC,

UNPUBLISHED
December 12, 2019

Plaintiffs/Counterdefendants-
Appellants,

v

No. 344982
Genesee Circuit Court
LC No. 12-099547-CK

MARIE A. LEMIEUX,

Defendant,

and

AEON GAMING LLC,

Defendant/Counterplaintiff-
Appellee.

Before: SWARTZLE, P.J., and MARKEY and REDFORD, JJ.

PER CURIAM.

This case arises from a contractual dispute regarding electronic-bingo equipment. We conclude that the trial court erred when it pierced the corporate veil and held that Blue Bay South, LLC was jointly and severally liable for Fraternal Enterprises, Inc.'s breach of contract. The trial court also erred in awarding monetary damages to Aeon Gaming, LLC based on its conclusion that the parties' contract provided a damages remedy if Fraternal failed to purchase a minimum number of units per year. Finally, the trial court erred in its award of damages to Aeon related to maintenance fees. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Fraternal and Aeon entered into an exclusive license and manufacturing agreement in June 2007 regarding electronic bingo equipment. The contract granted Fraternal exclusive rights

in the state of Michigan to sell, market, and lease Aeon's products under a limited license. The parties' contract referred to Fraternal as FEI. Paragraph 3 of the contract provided that "[t]he license granted under this Agreement shall remain exclusive only so long as FEI pays Aeon Gaming for the installation of 400 Units per calendar year as defined herein." The contract also provided a limited warranty under which, if there were issues with the units, Aeon would repair or replace them, and it provided a maintenance fee of $1 per unit per day to begin three years after the execution of the contract.

Shortly after the parties entered into the contract, Blue Bay purchased Fraternal's shares. Fraternal and Aeon then executed an addendum to the contract in December 2008, which provided that "[t]he units required to be installed per paragraph 3 of the Agreement is to be 400 per calendar year for a total of 4 years beginning in January 1, 2009." The addendum also altered the agreed-upon maintenance fee, reducing it to $0.50 per unit per day, and provided that

> the fee will not be charged for units which are being purchased on an installment basis from Aeon Gaming by FEI or for units which are being rented to end users on a shared rental revenue basis. FEI shall have the option to opt out of the maintenance fee agreement after the first 90 days subsequent to the unit's being paid for or three years after payments from FEI begin for the unit, whichever is earlier.

The parties' testimony at trial established that the electronic-bingo units had battery issues. The parties disputed the extent of the battery issues and whether Aeon resolved those issues. The parties agreed that the units frequently had cracked screens, though both parties acknowledged this was in part because charitable-bingo volunteers improperly stacked the units on top of each other instead of using the racks that Aeon provided to transport them.

Following a bench trial, the trial court found that Fraternal had agreed to purchase 2,000 units over the course of the contract and that Fraternal breached that agreement by purchasing only 990 units. Additionally, the trial court also found that Fraternal had failed to pay 90 days' worth of required maintenance fees for 2,000 units. Finally, the court found it was appropriate to pierce Fraternal's corporate veil and to hold Blue Bay jointly and severally liable for damages. Fraternal and Blue Bay appeal by right the trial court's judgment in favor of Aeon for $2,349,320 plus costs and interest.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

This Court reviews for clear error the trial court's findings of fact following a bench trial in a contractual matter and reviews de novo its conclusions of law. *Trader v Comerica Bank*, 293 Mich App 210, 215; 809 NW2d 429 (2011). A finding is clearly erroneous if, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake. *Augustine v Allstate Ins Co*, 292 Mich App 408, 424; 807 NW2d 77 (2011). The "proper interpretation of contracts and the legal effect of contractual provisions are questions of law subject to review de novo." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366-367; 817 NW2d 504 (2012). Whether a plaintiff is a real party in interest is a question of law

that we review de novo. *In re Beatrice Rottenberg Living Trust*, 300 Mich App 339, 354; 833 NW2d 384 (2013). Finally, this Court reviews de novo issues regarding piercing a corporate veil. *Lakeview Commons Ltd Partnership v Empower Yourself, LLC*, 290 Mich App 503, 509; 802 NW2d 712 (2010).

## B. REAL PARTY IN INTEREST

Fraternal and Blue Bay argue that the trial court erred by not dismissing the case on the basis that Aeon was not the real party in interest. As an initial matter, we note that although the trial court did not address this issue, Fraternal and Blue Bay both raised it. To preserve an issue for appellate review, a party must raise it before the trial court. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). This Court will not punish a party for the omission of the trial court if the party raised an issue before the trial court, but the trial court failed to decide the issue. *Id*. Therefore, this issue is preserved for appellate review.

"An action must be prosecuted in the name of the real party in interest." MCR 2.201(B). The "real-party-in-interest rule is essentially a prudential limitation on a litigant's ability to raise the legal rights of another." *Rottenberg Living Trust*, 300 Mich App at 355. The rule requires the party who owns the claim to prosecute it. *Id*. at 356. An assignee becomes the real party in interest to the extent that the assignment vests in the assignee the rights previously held by the assignor. *Cannon Twp v Rockford Pub Sch*, 311 Mich App 403, 412; 875 NW2d 242 (2015).

In this case, the parties' contract provided that the agreement could not be assigned or transferred by either party without the prior written consent of the other party. Aeon assigned its rights under the contract to Platinum Bank in December 2008 as part of the addendum mentioned earlier. Aeon's managing partner, James Landsem, testified that after Aeon's line of credit was repaid, Platinum reassigned the rights under the contract back to Aeon. Robert M. Robinson, one of Blue Bay's owners, testified that Fraternal was never asked to sign an agreement involving the assignment of rights from Platinum Bank to Aeon. For its part, Aeon acknowledges that its failure to obtain Fraternal's written permission for the assignment from Platinum Bank to Aeon was a technical violation of the parties' contract.

This does not mean, however, that Fraternal and Blue Bay were entitled to have the case dismissed. An invalid assignment does not warrant dismissing a lawsuit. See *Weston v Dowty*, 163 Mich App 238, 243; 414 NW2d 165 (1987). Regardless of whether Platinum properly reassigned the rights to Aeon, at the time of the filing of the countercomplaint, Aeon owned the cause of action and Fraternal was not entitled to have the suit dismissed. We conclude that the trial court did not err by failing to dismiss the suit on the basis that Aeon was not the real party in interest.

## C. PIERCING THE CORPORATE VEIL

Fraternal and Blue Bay argue that Aeon failed to establish the necessary elements to pierce the corporate veil and hold Blue Bay jointly and severally liable for Fraternal's conduct. We conclude that Aeon did not establish *any* of the elements necessary to justify ignoring the corporations' separate forms. Therefore, the trial court erred in awarding monetary damages against Blue Bay.

"As a general proposition, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock." *Foodland Distrib v Al-Naimi*, 220 Mich App 453, 456; 559 NW2d 379 (1996). "This fiction is a convenience, introduced to serve the ends of justice. However, when this fiction is invoked to subvert justice, it may be ignored by the courts." *Id*. (cleaned up). Traditionally, the corporate veil may be pierced "to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations." *Id*. To pierce the corporate veil, a party must show three elements: "(1) the corporate entity is a mere instrumentality of another individual or entity, (2) the corporate entity was used to commit a wrong or fraud, and (3) there was an unjust injury or loss to the plaintiff." *Lakeview Commons*, 290 Mich App at 510. A court should consider all relevant facts and assess them in light of the corporation's economic justifications to determine whether the corporation has abused its corporate form. *Foodland Distrib*, 220 Mich App at 456-457.

First, Aeon did not establish that Fraternal was the mere instrumentality of Blue Bay. A corporation might be the mere instrumentality of another corporation if the first corporation is the de facto owner of the second corporation, the corporations lend money back and forth to each other, or one corporation assumes another corporation's debts with no consideration. See *id.* at 457. In contrast, a corporation is not the mere instrumentality of another when the activities of the corporation are not comingled and any loans are secured and repaid. See *Lakeview Commons*, 290 Mich App at 510-511.

In this case, Blue Bay hired an operations manager after Fraternal's purchase, and Fraternal's salesperson testified that she took orders from the operations manager. Robinson testified, however, that Fraternal had a separate state license, separate employees, separate books, and separate licensing requirements. Fraternal's bank account was funded through its sales, which went entirely to Fraternal, and Fraternal was self-sufficient. Fraternal had its own accounting system and an outside CPA. Although Blue Bay cut checks for Fraternal and performed technical services for Fraternal, Fraternal paid fees to Blue Bay for those services, and Fraternal's employees also performed technical services.

Additionally, while Fraternal's former salesperson testified that she believed that Blue Bay transferred a "significant" number of accounts to Blue Bay from Fraternal, she testified those accounts did not include electronic-gaming accounts and that bingo-hall accounts were changed for the purposes of delivery and dispatching to reduce the number of truck trips. To the extent that the businesses were mingled for delivery and dispatching, in light of Blue Bay's corporate justification, we conclude that this conduct was not an abuse of the corporate form.

Second, Aeon argues that Blue Bay committed a wrong by tortiously interfering with its business relationship with Fraternal. Because Robinson was an owner of Blue Bay, who owned Fraternal, Aeon essentially argues that Robinson tortiously interfered in his own contract by ordering the salesperson to stop selling Aeon's units. Yet, Aeon did not establish that Blue Bay used Fraternal to commit a fraud or wrong. A fraud "must be established by clear and convincing evidence and must never be presumed." *Foodland Distrib*, 220 Mich App at 457. A fraud need not be shown, however, if the plaintiff demonstrates that the subsidiary was "manipulated by the owner for its own purposes and in its own interests to the prejudice of

innocent third parties, or the public welfare." *Herman v Mobile Homes Corp*, 317 Mich 233, 245-246; 26 NW2d 757 (1947) (cleaned up).

Aeon did not establish that Blue Bay used Fraternal to work a wrong on Aeon. No electronic-gaming accounts were moved as the result Blue Bay purchasing Fraternal. Fraternal continued to provide handheld-bingo units: Robinson testified that Blue Bay had about 2,000 handheld-bingo units in the field, and Fraternal had about 1,000 units in the field, of which 500 were Aeon units. While the salesperson testified that Robinson told her to stop selling Aeon's units, Robinson testified that if he said that, it was because the units were not working and customer complaints were "unresolvable." Extensive trial testimony from multiple witnesses concerned repeated issues with the units' batteries. Landsem testified that by 2010, everyone was getting frustrated with the reliability of Aeon's units. Considering the facts in light of the corporation's justifications, there is no indication that Blue Bay manipulated Fraternal to the prejudice of Aeon. Fraternal's actions were consistent with honest business practices rather than an abuse of its corporate form.

Third, Aeon did not establish that an unjust loss or injury occurred. An unjust injury occurs when the plaintiff cannot obtain a valid judgment against the party who breached an agreement because that party ceased operating to preclude a judgment. See *Lakeview Commons*, 290 Mich App at 511. In this case, Fraternal is a profitable company that demonstrated approximately $2.5 million a year in gross sales at the time of trial. Fraternal's bank account was funded through its sales, and Fraternal paid its own bills and was self-sufficient. Aeon did not suffer an unjust loss as a result of Fraternal's corporate form because there was no indication that Aeon could not obtain a judgment against Fraternal.

In sum, we conclude that Aeon did not establish the necessary elements to pierce Fraternal's corporate veil. Therefore, the trial court erred by piercing Fraternal's corporate veil and ignoring its corporate form to hold Blue Bay jointly and severally liable for Fraternal's breach of contract.

## D. BREACHING PARTY

Fraternal and Blue Bay argue that the trial court clearly erred when it found that Aeon did not first breach the parties' contract by providing defective units. We disagree.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). A party who first breaches a contract may not maintain an action against the other party for subsequently failing to perform. *Able Demolition, Inc v Pontiac*, 275 Mich App 577, 585; 739 NW2d 696 (2007). The rule only applies, however, if the initial breach was substantial. *Id*. A substantial breach occurred if the nonbreaching party did not obtain the benefit it reasonably expected to receive. *Id*.

In this case, Aeon provided Fraternal with a limited warranty that stated that if Aeon's products failed to operate properly, Fraternal would return the product to Aeon, and Aeon would repair or replace it. The contract expressly provided that Aeon made no additional warranties.

The parties presented extensive trial testimony regarding issues with Aeon's units. While Robinson and the technician testified that battery issues took place over an extended period of time and that the replacement lithium-polymer batteries had swelling and safety issues, the salesperson testified that the battery problem lasted "maybe a month or two." Landsem testified that, while the first replacement batteries were defective and "almost worse," Aeon "immediately contacted the manufacturer and they expedited 1,000 new batteries to us as soon as they could." Robinson and his technician testified that the batteries swelled and caused units to overheat, but the salesperson testified that she was the person who would have received complaints about the units and she received no complaints about swollen batteries. The salesperson testified that, after the batteries were replaced, complaints about the Aeon units "dropped back down to next to nothing."

Additionally, Fraternal asserted that Aeon's units had bad screens. Landsem testified, however, that he provided bingo halls with a plastic cart to take the units to the charging racks, but he witnessed volunteers not using the racks to move the units. Robinson acknowledged that the units had racks and that volunteers did not always use the racks but instead stacked the units on top of each other. Robinson's technician also testified that customers stacked the units too high and broke them because they were not made to stack.

This Court defers to the trial court's findings of credibility and will not substitute its judgment for that of the trial court. *Woodington v Shokoohi*, 288 Mich App 352, 358; 792 NW2d 63 (2010). In light of Aeon's limited warranty, the testimony of Landsem and the salesperson that the battery issues were properly addressed, and the testimony of Landsem, Robinson, and the technician that the screen issues were caused (at least in part) by user error, we are not definitely and firmly convinced that the trial court made a mistake when it found that Aeon was not the first party to breach the contract.

## E. DAMAGES

Fraternal and Blue Bay next argue that the parties' contract did not provide for monetary damages as a remedy if Fraternal failed to purchase 400 units a year from Aeon, but rather the contract provided that Aeon's remedy was that Fraternal would lose its exclusive license to sell Aeon's products. The goal of contractual interpretation is to honor the parties' intent and to enforce the contract's plain terms. *Davis v LaFontaine Motors, Inc*, 271 Mich App 68, 73; 719 NW2d 890 (2006). This Court discerns the parties' intent from the contract's language. *Id*. Contractual terms are construed in context, according to their commonly used meanings. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). Courts may not undermine the parties' freedom to contract by rewriting clear contractual language to comply with what the court perceives as the parties' intent. *DeFrain*, 491 Mich at 372.

In this case, the parties' 2008 contractual addendum provided that "[t]he units required to be installed *per paragraph 3 of the Agreement* is to be 400 per calendar year for a total of 4 years beginning in January 1, 2009." (Emphasis added.) In paragraph 3 of the parties' contract, the parties agreed that "[t]he license granted under this Agreement shall remain exclusive only so long as FEI pays Aeon Gaming for the installation of 400 Units per calendar year as defined herein." This paragraph also provided that, if Fraternal failed to do so, "the license granted herein shall automatically convert to a nonexclusive license with the right of Aeon Gaming, at its

sole discretion, to terminate the license within 90 days of the conversation to a nonexclusive license."

The only contractual language through which Fraternal agreed to install a minimum number of units was that portion of the 2008 addendum in which Fraternal agreed "to have installed a minimum of 800 handsets by the end of 2009." There is no dispute that Fraternal installed 990 units in 2008 and 2009. Accordingly, Fraternal did not breach the contract by failing to place less than an agreed-upon quantity of units. Rather, Fraternal failed to install 400 units a year for the next four calendar years, and the contract provided that the remedy for Fraternal's failure to do so was the conversion of Fraternal's exclusive license to a nonexclusive license. In sum, Fraternal did not breach the parties' contract with respect to the number of units installed, it merely did not install enough to maintain its exclusive license. By failing to install enough, Fraternal suffered the bargained-for penalty (loss of exclusivity), while Aeon received the bargained-for benefit (it could sell through another distributor and could terminate the contract early). The trial court erred as a matter of law in concluding that Fraternal breached the contract with respect to the units installed.

Aeon argues, however, that the license-revocation remedy does not exclusively apply because Aeon's contract also provided that it could seek damages at law for breach of the agreement. A specific contractual provision controls over a related but general contractual provision. *Id.* at 367 n 22. In this case, the contract's general default provision provided that,

> [i]n the event that . . . FEI breaches any provision of this Agreement, Aeon Gaming may, in addition to any other rights and remedies provided at law or in equity, . . . proceed by appropriate court action or actions, either at law or in equity, to . . . seek damages for breach of this agreement.

Paragraph 3 of the contract, however, provided a very specific remedy if Fraternal failed to purchase 400 units a year, which was that, "[u]pon failure of FEI to achieve such minimum annual sales the license granted herein shall automatically convert to a nonexclusive license," and Aeon could terminate the license within 90 days. The more specific relief for Fraternal's failure to achieve minimum-annual sales controls over the related but more general provision providing for damages at law.

We conclude that the trial court erred by awarding Aeon monetary damages on the basis that Fraternal breached the parties' contract by failing to purchase 400 units a year for four years. Awarding Aeon monetary damages essentially rewrote the contract's remedies, which only provided that if Fraternal did not purchase 400 units a year, its exclusive license would become a nonexclusive license and Aeon could terminate early. Because Aeon was not entitled to monetary damages on this basis, we need not reach Fraternal and Blue Bay's argument that the trial court incorrectly calculated damages with respect to any uninstalled units.

Finally, Fraternal and Blue Bay also claim that the trial court misconstrued the addendum's maintenance provision because it only applied if Fraternal had paid off the units but Aeon was still performing maintenance. Fraternal and Blue Bay argue in the alternative that the meaning of the contract is ambiguous because the parties are in disagreement about its meaning. The parties' dispute about the language of the contract does not render the contract ambiguous.

*Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 567; 596 NW2d 915 (1999). Accordingly, this argument lacks merit.

Fraternal argues that it was not liable for any maintenance fee because it had opted out of paying maintenance. Aeon argues that Fraternal could not opt out of the maintenance agreement unless 90 days had elapsed since the units were paid off or Fraternal had paid maintenance charges for three years. We conclude that both parties' positions are partially correct and partially incorrect. The trial court erred by applying the maintenance fee to units that Fraternal was purchasing on an installment basis, but it did not err by applying the maintenance fee to any units that Fraternal had paid off but had not yet paid maintenance on for 90 days when Fraternal opted out of the maintenance agreement.

Construing the parties' contractual provisions together, the installment-basis portion of the maintenance-fee agreement does not apply universally to each unit but only applies to some units in some circumstances. The parties' contract initially provided that Aeon would maintain the units for $1 a day, and that the fee was "waived during the first three (3) years of this agreement or when bank financing is paid in full by FEI of the installed units." The addendum altered this provision, providing, "The hardware maintenance fee in the second paragraph of Article 7 of the Agreement shall be $.50 per unit per day should FEI opt to maintain the hardware by shipping the units to Aeon gaming for service." The addendum also provided that "[t]he fee will not be charged for units which are being purchased on an installment basis from Aeon Gaming by FEI." Finally, the addendum had an opt-out provision:

> FEI shall have the option to opt out of the maintenance fee agreement after the first 90 days subsequent to the unit's being paid for or three years after payments from FEI begin for the unit, whichever is earlier.

On June 4, 2012, Landsem responded to an e-mail from Fraternal's CPA by stating, "We acknowledge you have decided to opt out of the Maintenance as of May 30, 2012."

Under the contractual provisions, Fraternal was not required to pay maintenance fees for units it was purchasing by installment payment. No contractual language precluded Fraternal from simply purchasing a unit by paying cash, and no contractual language precluded Fraternal from paying off a unit earlier than its financing period. Under these provisions, Fraternal would be required to pay a maintenance fee for at least 90 days on a unit it had purchased with cash and units on which it had not made three years' worth of payments, that is, units Fraternal had paid off early. Alternatively, if Fraternal was paying for the unit, it could opt out of maintenance fees for those units on which it had already made three years' worth of payments.

The trial court found that Fraternal owed maintenance of $0.50 for 90 days for each unit and ultimately ruled that Aeon was entitled to damages for 90 days of maintenance on 2,000 units at $0.50 a day. The trial court's findings were not consistent with either the contractual language or the evidence before the court. First, by finding that Fraternal owed maintenance fees for 2,000 units, the trial court failed to consider the contractual language providing that Fraternal did not owe maintenance fees for units it was financing when it was financing 990 of those units. The trial court also erroneously read language into the contract requiring Fraternal to pay

maintenance fees for units it had not purchased. The trial court erred as a matter of law by holding Fraternal liable for maintenance on the 1,010 units it did not purchase.

Second, there was evidence that Fraternal was still paying for some or all of the 990 units and therefore did not owe maintenance fees for them under the addendum. Robinson testified that after 2010, he was still making payments to Aeon. Landsem testified that Fraternal had made payments on the 990 units it had placed. Because there was evidence that Fraternal was financing the 990 units, and the contract provided that Fraternal was not required to pay maintenance fees for units it was financing, we are definitely and firmly convinced that the trial court made a mistake when it found that Fraternal was liable for maintenance fees for those units. On remand, the trial court may in its discretion reopen proofs to determine what number of units were subject to maintenance fees. See *Sullivan Indus, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 345; 480 NW2d 623 (1991).

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ James Robert Redford