NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0815n.06

Case No. 14-3422

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 11, 2015
DEBORAH S. HUNT, Clerk

MASCO CABINETRY MIDDLEFIELD, LLC, )
and THE INSURANCE COMPANY OF THE )
STATE OF PENNSYLVANIA, )
                )
                )    ON APPEAL FROM THE
      Plaintiffs-Appellants, )    UNITED STATES DISTRICT
                )    COURT FOR THE
v.                   )    NORTHERN DISTRICT OF
                )    OHIO
CEFLA NORTH AMERICA, INC., and )
CEFLA SC, )
                )    O P I N I O N
      Defendants-Appellees. )

BEFORE: MERRITT, McKEAGUE and WHITE, Circuit Judges.

McKEAGUE, Circuit Judge. This is a products liability action against the manufacturer of industrial manufacturing equipment used in the manufacture of residential cabinetry. The action, brought by the purchaser of the equipment and its insurer as subrogee, seeks nearly $5 million in damages for loss sustained as a result of a fire in the purchaser's manufacturing plant. The district court, on cross-motions for summary judgment, enforced terms contained in the equipment sales agreement and dismissed the action as time-barred. On appeal, plaintiffs insist that the manufacturer of the defective equipment was not a party to the sales contract and has no right to assert the contractual limitations period in defense of their tort

claims.  The analysis in the district court's opinion is thin.  Yet, on due consideration of the record, we conclude the result is correct and so affirm the judgment.

## I

Plaintiff Masco Cabinetry Middlefield, LLC ("Masco"), an Ohio company located in Middlefield, Ohio, is in the business of manufacturing residential cabinets.  On January 27, 2004, Masco, through its Kraftmaid Cabinetry division, entered into an agreement to purchase certain woodworking equipment.  The agreement is finalized by a three-page document entitled "Sales Agreement," prepared by Bob Langridge of Stiles Machinery, Inc. ("Stiles"), of Grand Rapids, Michigan.  Stiles is the authorized sales agent of defendant Cefla North America, Inc. ("Cefla NA"), which is a wholly owned subsidiary of, and exclusive distributor of products made by, Italian manufacturer, defendant Cefla SC.[1]

Pursuant to the Sales Agreement, Masco purchased a "Cefla Group Roll Coat System (UV3) . . . as per Proposal # CE-3227C dated January 26, 2004."  R. 37-5, Page ID 462.  The Proposal, prepared for Masco by Cefla NA and signed by its Project Engineer Dennis Echelbarger, is twenty-one pages in length.  It describes the various components of a woodworking production system to be custom designed and manufactured for Masco by Cefla SC in Italy and provides for installation and training in Middlefield by Cefla NA.  The Proposal's total price, including importation from Italy and installation in Middlefield was $2,832,819.  By its terms, the Proposal is "subject to our General Conditions of Sale" and its "offer is valid for thirty (30) days."  Don Cox signed the Sales Agreement on behalf of Masco on January 27, 2004, thereby accepting Cefla NA's Proposal, subject to a special discount of $239,819.

---

[1] Cefla North America was known as Cefla Finishing America, Inc., at the time of the sale and is successor in interest for all purposes related to this litigation.  Hence, all record references to Cefla Finishing America are treated herein as referring to Cefla NA.

The Sales Agreement includes two pages of "Standard Terms and Conditions of Sale," one applicable to Stiles and one applicable to Cefla NA. By virtue of the latter, the Sales Agreement thus explicitly includes the "General Conditions of Sale" referred to in the Proposal. The Sales Agreement also incorporates by reference terms and conditions of Masco's National Purchasing Agreement with Stiles.

The UV3 system was installed in Masco's Middlefield plant later in 2004. In October 2009, a fire occurred in the Middlefield plant where the UV3 production line was housed, causing substantial damage. Masco, together with its insurer, The Insurance Company of the State of Pennsylvania as subrogee (collectively, "Masco"), commenced this action in October 2011, asserting negligence and products liability claims against Cefla NA and Cefla SC, and claiming damages in the amount of $4,729,092. Defendants moved for summary judgment, contending that Masco's claims arose under the sales contract and should be dismissed as untimely because the contract bars action by Masco more than two years from the date of delivery of the equipment. The district court agreed and held that Masco's claims, filed more than two years after delivery of the equipment, are contractually time-barred.

## II

We review the summary judgment ruling de novo. *Smith v. Perkins Bd. of Educ.*, 709 F.3d 821, 825 (6th Cir. 2013). Under Rule 56, summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Smith*, 709 F.3d at 825. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present

a *genuine* issue of *material* fact.  A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.  *Id.*  A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.  *Sierra Club v. ICG Hazard*, 781 F.3d 281, 284 (6th Cir. 2015).  A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law—in this case, state law.  *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

### III

Here, the Cefla defendants' summary judgment motion was premised on the assertion that Masco's claims, albeit nominally tort claims, "arise out of the contract." Ordinarily, a federal court exercising diversity jurisdiction applies the choice-of-law rules of the forum state.  *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). Under Ohio law, different choice-of-law rules apply, depending on whether the cause of action sounds in contract or tort.  *Ohayon v. Safeco Ins. Co. of Illinois*, 747 N.E.2d 206, 208 (Ohio 2001).  Hence, the court must first classify the cause of action.  *Id.*  If the action stems from a pre-existing contractual relationship, then the parties had the opportunity to negotiate the law to be applied to disputes arising thereunder and the law would seek to protect the justified expectations of the parties.  *Id.* at 209.  A tortfeasor, on the other hand, who acts without a conscious regard for the legal consequences of his or her conduct, has no justified expectations to protect and different factors are considered to determine the governing law.  *Id.*

The Cefla defendants contend that Masco's claims—complaining of defectively and dangerously designed and manufactured equipment—though sounding in tort, do not arise in a vacuum; they necessarily stem from the Sales Agreement whereby Masco purchased the

equipment that defendants offered to design, fabricate and install. Defendants further contend that the parties' justified expectations are embodied in the Standard Terms and Conditions of Sale that are made part of the contract. These standard terms provide that the contract shall be deemed to have been made in Michigan and any action arising out of the contract shall be governed by Michigan law. They define the buyer's remedies upon discovery of a defect, as well as limitations of the seller's warranties. And they prescribe a two-year limitations period for claims arising out of the contract. Accordingly, defendants contend Masco's claims should be classified as claims sounding in contract and that the parties' contractual choice-of-law provision should be enforced. In support, they cite *Gen. Elec. Co. v. Siempelkamp GmbH & Co.*, 29 F.3d 1095 (6th Cir. 1994) (breach of contract, tort, breach of warranty, and products liability claims arising out of purchase, installation and operation of industrial machinery held to be subject to contractual choice-of-law provision); *Baumgardner v. Bimbo Food Bakeries Distribution, Inc.*, 697 F. Supp. 2d 801, 805–06 (N.D. Ohio 2010) (applying contractual choice-of-law provision to both tort and contract claims related to the contract); *Bohl v. Hauke*, 906 N.E.2d 450, 457 (Ohio Ct. App. 2009) (recognizing that where a claim is sufficiently related to subject matter of the contract, the contractual forum-selection clause cannot be defeated simply by artfully pleading a claim not explicitly governed by the clause).

Masco does not directly challenge the contention that its claims arise out of a contractual relationship reflected in the Sales Agreement, but contends the choice-of-law determination must be based on a proper understanding of the terms of the Sales Agreement. In connection with choice-of-law in particular, Masco argues that the preprinted standard terms choice-of-Michigan-law provision relied on by defendants was superseded by the terms and conditions of Masco's National Purchasing Agreement with Stiles, expressly made applicable by handwritten note on

the face of the Sales Agreement. Citing *Love v. Beck Energy Corp.*, 2015 WL 1453338 at *3 (Ohio Ct. App. 7 Dist.), Masco contends that handwritten terms prevail over typed or preprinted terms where there is a conflict between the two.

Yet, as the district court observed, there is no conflict between the two in regard to choice of law. The terms of the National Purchasing Agreement, incorporated by handwritten reference, originally included a choice-of-law clause providing that a "purchase order shall be construed and interpreted according to the laws of the state appearing in the Buyer's address on the face of [the] purchase order." R. 35-2 at 9, ¶ 24, Page ID 327. However, that provision had undisputedly been crossed out before the National Purchasing Agreement was finalized in 2001. *Id*. The district court therefore concluded that there was no conflict between the terms incorporated by handwritten reference in the Sales Agreement and the standard preprinted terms expressly made a part of the Sales Agreement. The court went on to hold that the parties' choice-of-law provision in the standard terms was unambiguous, uncontroverted and controlling.

In this conclusion, we find no error. Nothing in Masco's appellate arguments refutes the self-evident correctness of the ruling. Hence, although Masco's claims sound in tort, they clearly stem from the pre-existing contractual relationship that resulted in Masco's acquisition of the subject equipment. The claims are properly classified, under Ohio's choice-of-law rules, as arising out of the contract. It follows that the parties' justified expectations are best protected by enforcing their contractual choice-of-law provision. Michigan law governs.

## IV

The district court then considered defendants' argument that under Michigan law, Masco's claims are time-barred pursuant to ¶ 11 of the standard terms in the Sales Agreement: "No suit may be brought by Buyer for any breach by Seller or any other claim arising out of this

contract after two (2) years from the date of delivery of the goods covered." R. 37-5, Sales

Agreement, Page ID 464.  After summarizing the relevant standards under Michigan law, the

district court held as follows:

> The Stiles-CEFLA Terms and Conditions' contractual time limitation period provides that Buyer (Masco) had two years from the date of delivery of the goods to bring any cause of action regarding the goods governed by the contract. Similarly, the Stiles-Masco National Purchasing Agreement provides that Buyer (Masco) has one year from the date of delivery of the goods to bring any cause of action regarding the goods governed by the contract. Masco received the goods in 2004.  Plaintiffs filed this suit on October 14, 2011, seven years after the delivery of the goods.  This is well beyond either of the contractual periods.
>
> Defendant CEFLA's Motion for Summary Judgment is granted on the basis that Plaintiff Masco's claims are time-barred by the contractual limitations period.

R. 44, Opinion at 12, Page ID 765 (citations omitted).

Masco does not directly challenge this part of the district court's ruling, but rather insists

the Cefla defendants have no right to assert the terms of the Sales Agreement because they are

not parties to it.

## V

The district court summarily held that the Cefla defendants were rendered parties to the

agreement by virtue of the fact that the Cefla Standard Terms and Conditions of Sale are part of

the agreement.  Masco points out that the Sales Agreement was prepared by Stiles on a Stiles

form and that it is signed only by Masco's Vice President of Manufacturing Operations, Don

Cox.  Since no representative of the Cefla defendants signed the Sales Agreement, Masco

contends they have rights under the contract only if Stiles acted as their agent or if they can be

deemed third party beneficiaries of the contract.  As to the latter theory, Masco correctly

contends that defendants have not even argued that they are third party beneficiaries.  As to the

former, Masco insists the record is controverted and that there is a genuine dispute as to whether Stiles acted as the Cefla defendants' agent in finalizing the contract.

The contractual choice-of-law provision provides not only that enforcement of the contract shall be governed by Michigan law, but also that the contract shall be deemed to have been made in Michigan.  Under Michigan law, a contract is formed upon offer and acceptance and a mutual assent or meeting of the minds on all essential terms.  *Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006).  The "meeting of the minds" element is "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective state of mind."  *Id.* at 771 (quoting *Kalmanath v. Mercy Mem. Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992).

The parties do not dispute that a contract was formed when Masco, by executing the Sales Agreement on January 27, 2004, accepted Cefla NA's offer, as set forth in its Proposal, prepared for Masco (through its Kraftmaid Cabinetry division) and dated January 26, 2004.[2]  The essential elements the parties mutually assented to are set forth in great detail in the Proposal, including descriptions of more than thirty components, time of delivery and installation, price and terms of payment.  Nor is there any hint of argument that any party did not perform its obligations under the contract—apart from Masco's claims that UV3 equipment defects caused the 2009 fire.  The words in the Sales Agreement and Proposal make it clear that Stiles, as Cefla NA's authorized sales agent, supervised the memorialization of Masco's acceptance of Cefla NA's offer, whereby a meeting of the minds was achieved:  Cefla SC was obligated to fabricate the UV3 equipment components in Italy; Cefla NA was obligated to install them in Middlefield; and Masco was obligated to pay the purchase price on the agreed terms.  The parties' subsequent

---

[2] Our dissenting colleague takes issue with this statement, but there simply is no dispute that Masco's execution of the Sales Agreement gave rise to a contract.  What is in dispute in this litigation is *who* the parties to the contract are.

"visible acts" in performance of their contractual obligations further demonstrate the meeting of the minds among the parties to the contract, namely:  Masco, Cefla NA and Cefla SC.  Nothing in the Cefla NA Proposal, accepted by Masco in the Sales Agreement, expressly obligated Stiles to do anything.

But Masco argues that the document entitled "Sales Agreement," being a Stiles form, prepared by a Stiles employee, constitutes *the contract*.  And under that contract, Masco argues, Stiles was the seller, not Cefla NA.  Masco points out that no representative of Cefla NA or Cefla SC signed the Sales Agreement.  Masco maintains that Stiles and Masco are the only two parties to the contract.  In support of this understanding, Masco cites the affidavits of Cheryl Phillips, Masco's then Director of Corporate Purchasing; and Tom Anderson, Masco's then Director of Manufacturing Services.   Both affiants attest to their understanding:   (1) that the Sales Agreement was a contract between Masco and Stiles and that no Cefla entity was a party to the contract; (2) that the Sales Agreement was signed by Stiles' representative, Bob Langridge, not by any representative of the Cefla entities; (3) that the Sales Agreement was subject exclusively to the terms and conditions of the Masco-Stiles National Purchasing Agreement; (4) that the Cefla NA Standard Terms and Conditions made a part of the Sales Agreement were not actually intended to apply; and (5) that the Sales Agreement reference to the Cefla NA Proposal is significant only as a description of the machinery purchased from Stiles.

We are not persuaded.  First, Phillips' and Anderson's subjective understandings are entitled to little weight.  Under Michigan law, the elements of contract formation are "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective state of mind."  *Kloian*, 733 N.W.2d at 771 (quoting *Kalmanath.*, 487 N.W.2d at 503).

As explained above, the words and actions of the parties, objectively viewed, evidence a meeting of the minds between Masco and Cefla NA.

Second, the Sales Agreement was not "signed" by Langridge on behalf of Stiles; rather, he is identified on the form as the one who prepared the form. Moreover, the presence of Langridge's name on the form is entirely consistent with the Proposal's identification of him as a Stiles employee who served as Cefla NA's Sales Representative. It is also consistent with the Agency Agreement, which defines the principal-agent relationship between Cefla NA and Stiles and designates Stiles as "Authorized Agent of Cefla [NA] for the sale of Cefla Products in the United States." R. 38-2, Agency Agreement at 3, Page ID 598. Indeed, Cefla NA's position on the limited nature of Stiles' role in the transaction finds support in correspondence from Stiles' General Counsel, Michael Callahan, to the Cefla entities in December 2002:

> In the process of actively promoting Cefla products, Stiles has come across certain customers that are not as familiar with [Cefla NA] as they are with Stiles and these customers are not comfortable entering into any agreement with [Cefla NA]. Consequently, in order to keep the transaction alive, Stiles will present the customer with a Stiles Sales Agreement which the customer is willing to sign, and then Stiles submits the signed Sales Agreement to [Cefla NA] for fulfillment.

R. 37-4, Laghi Aff. at 5, Page ID 428. This correspondence at once explains why the Masco purchase order was communicated on a Stiles form; undercuts Masco's argument about the form's significance; and supports the conclusion that Stiles acted as Cefla NA's agent in the transaction.[3]

Third, Masco's argument that the Cefla standard terms were not intended to be part of the contract is belied by the fact the Sales Agreement physically includes the Cefla NA standard

---

[3] The dissent also views the Callahan letter as significant. Yet, whereas the letter describes Stiles' role—requiring Stiles to submit the signed Sales Agreement to Cefla for fulfillment—in a manner entirely consistent with the Proposal's identification of Stiles employee Robert Langridge as mere sales representative, the dissent inexplicably construes the same language as evidence that Stiles was actually the owner and seller of the equipment—i.e., equipment that had not even been fabricated yet. The dissent's proposed construction of the Callahan letter, like Masco's purported subjective understanding of the Sales Agreement, is contradicted by the actual facts, i.e., the visible acts surrounding formation of the contract and its subsequent performance.

terms *and* refers to the terms of the Masco-Stiles National Purchasing Agreement, side-by-side. The Sales Agreement includes no indication that the Cefla NA terms do not apply.  That is, the Cefla NA terms were not crossed out or modified in any way, although other preprinted terms on the form (i.e., terms of payment) were crossed out.

Fourth, the notion that the Masco-Stiles National Purchasing Agreement controls (i.e., an agreement between Masco and Stiles, incorporated in the Sales Agreement only by handwritten reference) might have merit if Masco were proceeding against Stiles in connection with Stiles' role in the contract, but it's not.  Rather, Masco is proceeding against Cefla NA, a party whose role in the contract is expressly set forth in its Proposal and expressly governed by other standard terms and conditions that are not only referenced, but physically attached to the Sales Agreement.

Finally, in light of all the above, the assertion that the Sales Agreement's express reference to Cefla NA's Proposal does not evidence Masco's acceptance of the Proposal—prepared in great detail specifically for Masco—but represents simply a shorthand description of machinery to be purchased from Stiles—rendering Cefla NA a stranger to the contract—is simply not plausible.  The notion that Cefla NA is not a party to the contract, despite the role played by Cefla NA's Proposal and despite the physical inclusion of Cefla's standard terms in the Sales Agreement, is further belied by the parties' subsequent conduct in performance of the contract.  Stiles did not design, manufacture, own, sell and install the equipment; Cefla NA and Cefla SC did.

## VI

Masco insists, however, that there is at least a question of fact regarding the district court's implicit conclusion that Stiles acted as Cefla NA's agent and that Stiles' principal was

therefore bound by and entitled to enforce the contract. This question of fact, Masco contends, should have precluded summary judgment.

Under Michigan law, which also governs construction of the Agency Agreement between Cefla NA and Stiles, "a principal is bound by an agent's actions within the agent's actual or apparent authority." *James v. Alberts*, 626 N.W.2d 12, 15 (Mich. 2001). "A duly authorized agent has the power to act and bind the principal to the same extent as if the principal acted." *In re Estate of Capuzzi*, 684 N.W.2d 677, 679 (Mich. 2004). "An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Mais v. Allianz Life Ins. Co. of N. Am.*, 34 F. Supp. 3d 754, 761–62 (W.D. Mich. 2014) (quoting *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992)). "The test of whether an agency has been created is whether the principal has a right to control the actions of the agent." *Id.* (quoting *Meretta*, 491 N.W.2d at 280). The existence of an agency relationship generally presents a question of fact, unless the material facts are not disputed. *Vargo v. Sauer*, 576 N.W.2d 656, 666 (Mich. 1998).

Masco points to language in the Cefla NA-Stiles Agency Agreement itself as demonstrating that no agency relationship existed:

> This Agreement shall not constitute Agent the legal representative of Principal for any purpose whatsoever, nor shall Agent hold itself out as such. Agent has the status of an independent entrepreneur, and is granted no right or authority to assume or create any obligation or liability for or on behalf of Principal or to otherwise bind Principal or to use Principal's name other than as may be expressly authorized by Principal or permitted by Paragraph 4 above.

R. 38-2, Agency Agreement at 5, ¶ 9, Page ID 600. Masco's reading is contrived. In a ten-page document appointing Stiles "Agent" of Cefla NA, "Principal," and defining the authority granted Stiles as Agent, this paragraph merely makes clear that Stiles was not Cefla NA's "legal representative" and had no right or authority other than those expressly granted. Stiles' actions

in facilitating execution of the Sales Agreement were within the bounds of the authority expressly granted under paragraph 4 of the Agency Agreement.  Paragraph 9 of the Agency Agreement does not undermine the conclusion that an agency relationship existed and that Stiles acted within its authority as Cefla NA's agent.

Masco also points to several items evidencing Stiles' involvement in pre-contract negotiations, and as well as its post-contract invoicing of amounts payable by Masco.  These actions, too, are not inconsistent with authority undisputedly granted Stiles under the Agency Agreement.  While Stiles' actions promoting, facilitating, and supporting the sale of the UV3 equipment may have contributed to subjective misunderstanding of Stiles' role in the transaction, they do not undermine the well-supported conclusion that Stiles was in fact acting within its authority as Cefla NA's agent.  Masco's argument that a genuine fact issue is presented is supported by no more than a mere scintilla of evidence, which is insufficient to undermine the summary judgment ruling.

## VII

Finally, Masco contends the district court's ruling failed to properly distinguish between the two Cefla defendants.  Indeed, whereas much of the above analysis upholding the summary judgment ruling applies to Cefla NA, Cefla SC is a separate corporation.  Cefla SC's role as manufacturer of the subject equipment was integral to performance of the contract, but its role was distinct.

This issue was first raised below only after the district court had granted the Cefla defendants' motion for summary judgment by way of a motion for relief from judgment under Fed. R. Civ. P. 60(b)(1).  Masco argued that the district court made a mistake of law and fact by treating both Cefla entities as essentially one and the same.  Whereas the materials relied on to

justify Cefla NA's right to enforce the contractual time-bar—i.e., the Cefla Standard Terms and Conditions of Sale, the Proposal, and the Agency Agreement—all refer to Cefla NA, none of them refers to Cefla NA's parent corporation, Cefla SC.  The district court denied relief, noting that Masco had not made the distinction in its summary judgment briefing, but had itself "repeatedly referred to both entities interchangeably."  R. 55, Opinion at 3, Page ID 823.  The court also took note of allegations in Masco's amended complaint, recognizing that Cefla SC and Cefla NA were parent and wholly-owned subsidiary, who together visited Masco's Middlefield plant in negotiating the contract and who together designed and manufactured the UV3 system.  Further, the court noted that the collaborative relationship between the Cefla entities in negotiating and performing the contract is made manifest in Sales Agreement and Proposal references to shipment of the equipment from Italy, where Cefla SC was located and where the actual manufacture of the equipment would be accomplished.

We note first that Masco's challenge to the denial of relief from judgment is not properly before us.  Masco filed its notice of appeal challenging the summary judgment ruling before the Rule 60(b)(1) ruling was made and never filed an amended notice of appeal specifically challenging the latter ruling.  *See* Fed. R. App. P. 4(a)(4).  But even if it were properly before us, we would find the claim to be without merit, for the reasons that follow.

The court's denial of relief under Rule 60(b)(1) is reviewed for abuse of discretion.  *Tyler v. Anderson*, 749 F.3d 499, 509 (6th Cir. 2014).  Rule 60(b) relief is not designed to "allow a defeated litigant a second chance to convince the court to rule in his or her favor by presenting new explanations, legal theories, or proof."  *Id*.  The district court's discretion in addressing such a motion is "especially broad" and our review is "limited and deferential."  *Id.*

Michigan law generally presumes that parent and subsidiary companies are distinct entities.  *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995).  In determining whether separate corporate existence should be disregarded in relation to contractual responsibilities—because the subsidiary acted as "mere instrumentality or adjunct" of the parent—"each case is sui generis and must be decided in accordance with its own underlying facts." *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947).

Under these standards, Masco falls far short of showing an abuse of discretion.  For all the reasons explained by the district court, it is apparent, under the unique circumstances of this case, that the Cefla entities operated in tandem with each other to negotiate and perform obligations under the contract.  Both are properly deemed bound under the terms of the contract and we see no reason to disturb the conclusion that both Cefla defendants are equally entitled to summary judgment on Masco's claims against them.

## VIII

Accordingly, the judgment of the district court is **AFFIRMED**.

**HELENE N. WHITE, Circuit Judge, dissenting.**

I respectfully dissent from the majority's conclusion that Masco's tort claims against the Cefla companies (Cefla) are barred by printed terms attached to the Sales Agreement between Masco and Stiles.[1]  The record clearly establishes that those printed terms are not part of Masco's contract with Stiles and that Masco had no contract with Cefla.  Further, if the handwritten term adopting Masco's terms and conditions is not recognized as superseding the printed terms and conditions on which Cefla relies, there is clearly at least a question of fact whether Masco agreed with either Stiles or Cefla that Cefla's printed terms would apply, thus precluding summary judgment.  I would reverse and remand.

Masco's parent company, Masco Corporation, entered into a National Purchasing Agreement (NPA) with Stiles in 2001, setting forth standard terms and conditions for all orders submitted to Stiles by Masco Corporation and its subsidiaries, including Masco.  Masco and Stiles renewed the NPA for calendar year 2004, during which the sale at issue took place.  On January 26, 2004, Cefla sent Masco a proposal for the sale of the UV3 roll-coat system.  In the twenty-one page proposal, Cefla detailed the equipment's custom specifications and offered to sell the UV3 equipment to Masco for $2,832,819.  Bob Langridge, a Stiles employee, is identified as the sales representative on the first page of the proposal.  The last page of the proposal states that the equipment is "offered subject to [Cefla's] General Conditions of Sale." R. 37-5, Proposal, PID 485.  The day after Cefla sent the proposal, Langridge prepared a separate document on Stiles letterhead for the sale of the equipment to Masco by Stiles.  This Sales Agreement describes the equipment, offers a discounted price of $2,600,000, shipping terms, and, although Stiles's "Standard Terms and Conditions of Sale" are printed on the reverse side of

---

[1] The companies' current names are used for clarity.  The parties do not dispute that Cefla and Masco are the respective successors of Cefla Finishing America, Inc. and KraftMaid Cabinetry, Inc., the relevant corporate entities in 2004.

the Sales Agreement and a second sheet containing Cefla's "Standard Terms and Conditions of Sale" is also attached, the front page of the agreement states in handwriting: "Masco terms and conditions apply according to current National Purchasing Agreement with Stiles Machinery." R. 37-5, Sales Agreement, PID 462. Masco's Vice President of Manufacturing Operations Don Cox signed the Sales Agreement on January 27, 2014. Three days later, Stiles sent Masco an invoice for $2,600,000. Consistent with the NPA, the invoice identifies the Sales Agreement as an order from Masco to Stiles.

The majority views Cefla's proposal as an offer and the Sales Agreement as an acceptance. Maj. Op. at 8–9. I find no basis for this construct.[2] First, Masco made no promise to Cefla. *See Williams v. Ormsby*, 966 N.E.2d 255, 258 (Ohio 2012) (defining a contract as a promise or set of promises actionable upon breach).[3] Rather, Masco accepted the Sales Agreement proffered by Stiles, which contained different terms, including a discounted price and the adoption of the terms and conditions of the NPA. Under this agreement, Masco promised to pay Stiles for the UV3 equipment, and Stiles promised to provide it at the agreed price according to the terms and conditions of the NPA and the specifications referenced in the proposal. Masco made no promises to Cefla and there was no "manifestation of mutual assent" to Cefla's printed

---

[2] Contrary to the majority's assertion, Masco does not concede "that a contract was formed when Masco, by executing the Sales Agreement on January 27, 2004, accepted Cefla NA's offer, as set forth in its Proposal," or that "the essential elements the parties mutually assented to are set forth in great detail in the proposal." Maj. Op. at 8. Masco argues that "[t]he only agreement for the purchase of the UV3 production line was the Masco-Stiles Sales Agreement, which was indisputably a contract solely between Masco and Stiles Machinery." Masco Br. at 11.

[3] Federal courts sitting in diversity apply the law of the forum state to determine whether there is a valid choice-of-law provision. *See Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 616 (6th Cir. 2014) (upholding a choice-of-law provision under the law of the forum); *Langley v. Prudential Mortg. Capital Co., LLC*, 546 F.3d 365, 368 (6th Cir. 2008) (holding that the law of the forum applies to the determination whether there is a valid contract with a forum-selection clause); *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000) (applying the law of the forum to determine whether a choice-of-law provision governs). If there is no contract, there can be no contractual choice of law. The majority puts the cart before the horse by first deciding that Michigan law governs under a contractual choice-of-law provision, then applying Michigan law to determine whether there is a contract. *See* Maj. Op. at 7–8. Cefla does not contest that Ohio law governs this initial question of contract formation. *See* Cefla Br. at 11 ("Ohio law governs the interpretation of the Parties' contract because this case was filed in federal court in Ohio."). In any event, the choice of law is not determinative in this case.

language. *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 31 (Ohio 2004). Even if the Masco-Stiles Sales Agreement is reimagined as a legal act in relation to Cefla rather than Stiles, Masco's signing the Sales Agreement can only be viewed as a counteroffer proposing altered terms, including a discounted price and the handwritten provision that the NPA's terms apply. There is simply no basis to conclude that the Sales Agreement constitutes Masco's acceptance of Cefla's proposal with its standard terms and conditions.

Without doubt, Cefla was intimately involved in the transaction through its design and manufacture of the UV3 line for Masco. But it does not follow that Cefla is a party to the Sales Agreement or that its printed terms are part of that contract. In 2002, Stiles sent a letter to Cefla explaining that Stiles had "come across certain customers that are not as familiar with [Cefla] as they are with Stiles and . . . are not comfortable entering into any agreement with [Cefla]." R. 37-6, Callahan Letter, PID 492. In order to "keep the transaction alive," Stiles would "present the customer with a Stiles Sales Agreement which the customer is willing to sign and then Stiles [would] submit[] the signed Sales Agreement to [Cefla] for fulfillment." *Id.* The letter makes clear that Stiles proposed to contract directly with end customers and shoulder the responsibility for procuring fulfillment by the Cefla companies. In line with this understanding of Stiles's role, Masco and Stiles entered into a contract obligating Stiles to sell, and Masco to buy, a Cefla designed and manufactured UV3 line using the NPA negotiated between Stiles and Masco.

The majority is persuaded that Cefla is in privity with Masco in part because the Cefla equipment is described in the Stiles Sales Agreement by reference to Cefla's proposal. Maj. Op. at 11. Under the heading "Machinery Description," the Sales Agreement states, "Cefla Group Roll Coat System (UV3) (Reference Cefla Drawing No. CE04-0133-14) as per proposal # CE-3227C dated January 26th, 2004." R. 37-5, Sales Agreement, PID 462. Masco asserts,

consistent with the NPA, that this language is only a reference to the equipment's technical specifications, not an acceptance of Cefla's  proposal.  The majority rejects this argument as "not plausible."  Maj. Op. at 11.  I disagree.  Not only is the argument plausible, it is persuasively supported by the terms of the NPA expressly incorporated into the Sales Agreement.  The NPA provides:

> This purchase order is Buyer's offer limited to the specific terms and conditions of this offer and does not constitute an acceptance by Buyer of any offer to sell or quotation of Seller.  Any reference to Seller's offer to sell or quotation is solely for the purpose of incorporating the description and specifications of the goods and services covered hereby to the extent that such description and specifications do not conflict with the description and specifications on the face of this purchase order.

R. 35-2, NPA, PID 321.  Masco's position is consistent with the bargained-for terms that exclusively govern its long-term purchasing arrangement with Stiles.

Lastly, the majority concludes that Cefla is a party to the Sales Agreement because Stiles was acting as its agent.  But concepts of agency and privity are simply red herrings; whoever the parties to the Sales Agreement may be, the contract terms control.   Here, even accepting the fiction that Cefla is somehow a party to the Sales Agreement between Stiles and Masco, that contract does not include the printed terms on which Cefla relies because the NPA supersedes the printed form.  The majority's conclusion that the Cefla terms attached to the Stiles Sales Agreement are part of the contract between Masco and Stiles and further evidence that Cefla is party to the contract is unfounded.  *See* Maj. Op. at 6, 11.  Basic contract law instructs that the NPA terms control.  Taking the Sales Agreement as including the front page with the specifics of the agreement and handwritten entries, together with Stiles's printed terms and conditions on the reverse side and the attached printed sheet containing Cefla's terms and conditions, the Sales Agreement purports to incorporate three sets of terms and conditions.  First, there is a

handwritten note that provides, "Masco terms and conditions apply according to current national purchasing agreement with Stiles Machinery." R. 37-5, Sales Agreement, PID 462. Second, there is a printed statement that provides, "Your order is subject to the terms and conditions on the reverse side"—namely, the Stiles terms. *Id.* And third, there is Cefla's printed terms.[4] The two relevant sets of terms—the NPA terms and the Cefla terms[5]—conflict. Each set of terms purports to exclude the other terms in their entirety. The NPA provides, "Seller's standard terms and conditions of sale, whether communicated in writing, electronically, or by any other media, shall have no force or effect," and "[a]ny terms or conditions proposed in Seller's acceptance of this offer which add to, vary from or conflict with any of the terms or conditions of this purchase order are deemed to be material and are hereby objected to and rejected." R. 35-2, NPA, PID 319, 321. On the other hand, Cefla's standard terms and conditions provide that Masco's "acceptance of any part of the goods sold hereunder, any payment by Buyer for such goods, or any other form of acceptance by Buyer, shall constitute Buyer's acceptance of all terms and conditions herein," and Cefla "objects to any terms and conditions proposed by Buyer which vary the terms hereof." R. 37-5, Sales Agreement, PID 464. Thus, there is a conflict on the face of the Sales Agreement between the handwritten provision that Masco's terms apply and the printed language that Cefla's terms apply.

Applying Ohio rules of contract construction, which reflect the most basic contract principles, the Masco terms prevail over the Cefla terms. "When there is a conflict between any of the preprinted provisions of a contract and those inserted in handwriting at the time the contract is executed, the handwritten terms will control." 18 Ohio Jur. 3d Contracts § 135; *see*

---

[4] Although "reverse side" implies only one page of terms, the parties appear to agree that the printed statement refers to both of the additional pages. *See, e.g.*, R. 37-5, Anderson Dep., PID 447 (describing the Sales Agreement as a three-page document including both the Stiles terms and the Cefla terms).

[5] Tellingly, no one argues that Stiles's printed terms and conditions apply.

*also Farmers' Nat'l Bank v. Del. Ins. Co.*, 94 N.E. 834, 834 (Ohio 1911) ("Where there is a conflict between any of the printed provisions of a contract and those inserted in writing at the time the contract is executed, the latter will control."); *Love v. Beck Energy Corp.*, No. 14 NO 415, 2015 WL 1453338, at *3 (Ohio Ct. App. Mar. 31, 2015) ("In looking at the four corners of a contract there is a rule of construction that provides handwritten prevails over typed or preprinted terms when there is a conflict between the two."). Here, the terms and conditions of the Masco-Stiles NPA were expressly incorporated in handwriting, thus negating Cefla's conflicting preprinted terms.

Further, "[w]hen confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003); *see also Skinner v. Guar. Trust Life Ins. Co.*, 813 F. Supp. 2d 865, 869 (S.D. Ohio 2011). "The court examines the contract as a whole and presumes that the intent of the parties is reflected in the language used in the agreement." *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Utils. Comm'n*, 954 N.E.2d 104, 110 (Ohio 2011). Here, the handwritten provision and the entire course of dealing between Masco and Stiles make clear that the contracting parties intended to supersede the printed terms with the terms of the NPA, and the NPA makes clear that Masco's purchasing relationship with Stiles is premised on the bargained-for, exclusive terms of that agreement.[6]

The district court determined Masco's claims would be barred under either the Cefla terms or the NPA terms, R. 44, Opinion and Order, PID 763–64, and the majority accepts this analysis, Maj. Op. at 7. It is indeed true that the liability-limiting language of both documents would bar this tort action if either applies to Cefla. However, for the reasons discussed,

---

[6] Applying Michigan law would yield the same result. *See, e.g.*, 5A Mich. Civ. Jur. Contracts § 149 ("The intention of the parties, as expressed in their contracts, is to govern in the construction of the contracts."); *id.* § 163 ("The written portion of a contract, if inconsistent with any part of the printed form, must govern and control.").

regardless what the Cefla terms say, they are not part of the contract.  And, the NPA does not assist Cefla because there is no provision in the NPA limiting Cefla's liability.  The NPA's limitation-of-liability provision by its terms applies only to Stiles.[7]  Cefla could have required that Stiles procure Masco's agreement to the Cefla terms it now seeks to enforce, but it did not. Or, Cefla could have insisted that the NPA's limitation of Stiles's liability also apply to Cefla, but it failed to do this as well.  Thus, even if Cefla is deemed a party to the Sales Agreement, or if Stiles is seen as Cefla's agent, the contract simply does not bar Masco's tort claims against Cefla.

I would reverse the grant of summary judgment to Cefla and remand for further proceedings.[8]

---

[7] The NPA has an attached Warranty Statement that refers to Stiles's warranties, obligations, and liability. It limits Stiles's warranty to claims of which it receives notice no later than one year following delivery and further provides:

> IN NO EVENT SHALL **STILES** BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES, WAHTSOEVER, [*sic*] (INCLUDING, WITHOUT LIMITATION, PERSONAL INJURY, PROPERTY DAMAGE, LOST PROFITS OR OTHER ECONOMIC INJURY) EVEN IF STILES HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  **STILES** SHALL HAVE NO LIABILITY TO THE PRUCHASER [*sic*] UNDER TORT THEORIES FOR ANY ALLEGED DESIGN DEFECT OR FOR ANY ALLEGED FAILURE TO WARN.

R. 35-2, NPA, PID 331 (emphasis added).

[8] To be clear, I would hold only that this tort action against Cefla is not barred by the Cefla printed terms and conditions or the NPA, and do not express an opinion regarding any other legal impediments to Masco's recovering in tort against Cefla.